ADJUSTRITE SYSTEMS, INC., Stuart J. Orr, and Lu Elliott, Plaintiffs–Appellants,

v.

GAB BUSINESS SERVICES, INC. and Intermodal Technical Systems, Inc., Defendants–Appellees.

No. 334, Docket No. 96–9715.

United States Court of Appeals, Second Circuit.

Argued Oct. 9, 1997.

Decided May 29, 1998.

Peter K. Ledwith, White, Quinlan, Staley & Ledwith, Garden City, NY, for Plaintiffs–Appellants.

Patrick W. Brophy, McMahon, Martine & Gallagher, William D. Gallagher, of counsel, New York, NY, for Defendants–Appellees.

Before: KEARSE and CABRANES, Circuit Judges, and CHIN, District Judge.*

CHIN, District Judge:

In this case, the parties agreed to the transfer of some $1 million in assets and signed an informal two-page document to memorialize their agreement. The two-page document, however, provided for the execution of a "sales agreement contract" as well as other agreements. These additional agreements were never executed.

The issue thus presented is whether, by signing the two-page document, the parties entered into a binding contract or whether they merely signed an unenforceable agreement to agree. The district court held that the parties' preliminary agreement was an unenforceable agreement to agree and granted summary judgment in favor of defendants-appellees dismissing the complaint. We affirm.

## STATEMENT OF THE CASE

### A. The Facts

The following facts are not in dispute. Plaintiffs-appellants Adjustrite Systems, Inc. ("Adjustrite"), Stuart J. Orr, and Lu Elliott (the "plaintiffs") are the developers of a computer software program for use by insurance companies and others in assessing the cost of repairs to damaged automobiles. The program relied on a database provided to Adjustrite by Motors Publishing Co. ("Motors") pursuant to a licensing agreement dated January 27, 1992.

Some three months after granting the license to Adjustrite, Motors entered into a licensing agreement with one of Adjustrite's competitors, CCC, for the use of the database. The CCC license agreement contained a restrictive covenant that limited Motors' ability to grant new licenses. Because the Adjustrite license preceded the CCC license agreement, however, Adjustrite retained full

rights under its license agreement. The Adjustrite–Motors license was a year-to-year license and it was renewed in 1993 and 1994. According to Adjustrite, Motors represented that Adjustrite's license would be renewed as long as Adjustrite did not breach any of its obligations under the license agreement.

Defendants-appellees GAB Business Services, Inc. ("GAB") and its wholly-owned subsidiary, Intermodal Technical Systems, Inc. ("ITS"), purchased the computer program from Adjustrite and were pleased with it. In April 1994, GAB and ITS approached Adjustrite to discuss the possibility of a merger or acquisition. Negotiations ensued over the next few months, during the course of which GAB and ITS expressed their concern that Motors might not continue to renew Adjustrite's license because of the CCC license. Eventually, GAB and ITS asked Adjustrite to seek a long-term extension of its license agreement with Motors. They also inquired as to whether Adjustrite's license could be assigned to them directly.

On November 11, 1994, after further negotiations but before the issue of an extension of the Adjustrite–Motors license agreement could be resolved, ITS sent Adjustrite a two-page proposal, which was signed by its president and chief executive officer and which read in pertinent part as follows:

### PROPOSAL FOR ASSET PURCHASE FROM ADJUSTRITE SYSTEMS, INC.

GAB desires to purchase certain assets of Adjustrite Systems, Inc., namely proprietary software for adjusting auto physical damage; the license to access the Motors Link Data Base; existing system sales contracts; the continuing professional services of Mr. Stu Orr and Mr. Lu Elliott; and full use of the Adjustrite name. No stock purchase will occur.

In consideration for the above assets and other considerations, GAB offers the following:

* The Honorable Denny Chin of the United States District Court for the Southern District of New York, sitting by designation.

1. Nine Hundred Thousand Dollars ($900,000) cash with an immediate payment of Two Hundred Thousand Dollars ($200,000) based upon acceptance of this offer and a mutually signed letter of intent.
2. Seven Hundred Thousand Dollars ($700,000) will be paid upon the execution of a sales agreement contract.
3. Staff position contracts will be generated upon the execution of the sales agreement, which will provide five (5) years of employment for Mr. Stu Orr and Mr. Lu Elliott, said contracts to extend to December 31, 1999. . . .

The proposal was signed by E. Matthew Marks, as "President and CEO" of ITS, under the words: "Offer made this 11th day of November, 1994." At some point, the reference in paragraph 1 to "$900,000" was changed by hand to "$950,000," with the change initialled by Orr and Marks. Orr signed for Adjustrite under the words "Accepted By."[1] The Agreement was not signed by Orr individually nor was it signed by Elliott at all. Shortly thereafter, Orr and Elliott began working directly for ITS and GAB.

Although the Agreement called for the execution of a letter of intent, a sales agreement, and two employment contracts, no additional documents were ever executed. Drafts of the sales agreement and two employment contracts were prepared but never finalized or signed. The draft sales agreement, which was entitled "Acquisition Agreement," contained provisions not contained in the Agreement.[2] For example, the draft sales agreement provided for a schedule of all "tangible assets" to be transferred as well as a schedule of all of Orr's and Adjustrite's "rights and interests in the copyrights, software, and tradenames" to be transferred. It provided for a closing date, a bill of sale, assignments, opinion letters, and other documentation. And it contained numerous representations and warranties as well as confidentiality and indemnification provisions. The draft employment contracts also contained provisions not covered in the Agreement, including: termination provisions; a limit on the total incentive compensation to be paid to Orr during the term of the contract; descriptions of the employee's duties and responsibilities; non-competition provisions; and proprietary information and confidentiality provisions.

In the weeks following execution of the Agreement, ITS and GAB again raised concerns about the Adjustrite–Motors license agreement and pressed the issue of whether GAB could enter into a licensing arrangement with Motors directly. Eventually, GAB and ITS asked Motors for a modification of the Adjustrite license agreement. Motors refused to consider any amendment, however, and on February 1, 1995 Adjustrite's license agreement expired and was not renewed by Motors.

In April 1995, GAB and ITS advised Adjustrite, Orr, and Elliott that they were withdrawing from the transaction. At that point, Orr and Elliott were fired.

### B. The Proceedings Below

Plaintiffs commenced this diversity action below against defendants on February 5, 1996. The complaint asserted three causes of action for damages for breach of contract, one on behalf of each of the three plaintiffs. In substance, the complaint alleged that the Agreement constituted a contract by which defendants were bound to purchase the assets of Adjustrite for $950,000 and to employ Orr and Elliott for five years each. The complaint alleged further that defendants had breached the Agreement. Defendants

---

**1.** Hereafter we refer to the signed November 11, 1994 document as the "Agreement." Although it is perhaps more accurately described as a "preliminary manifestation of assent," see Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 72 (2d Cir.1989), for ease of reference we will simply call it the "Agreement," with the understanding, of course, that the issue before us is whether it is a binding agreement or merely an unenforceable agreement to agree.

**2.** Plaintiffs rely on the affidavit of the attorney who represented them in the transaction, who states that the draft Acquisition Agreement did not contain "any new material elements." In the face of the plain wording of the documents, Judge Brieant correctly held that this conclusory statement was not sufficient to raise an issue of fact.

asserted two counterclaims against plaintiffs, for fraud and negligence.

Defendants moved for summary judgment, on two grounds. First, they argued that the Agreement was unenforceable as a matter of law because it did not evidence an intent by the parties to be bound. Second, they argued as a factual matter that it was undisputed that Adjustrite was unable to perform its part of the bargain because the "most material part" of the consideration to be transferred to defendants—the Adjustrite–Motors license—had lapsed.

Ruling from the bench, the district court granted the motion on the basis of defendants' first argument, not reaching the second argument. With respect to the first argument, Judge Brieant made the following observations:

> [T]here is no question in my mind that when Mr. Marks signed [the Agreement] he thought he had a deal, that he wrote to his principals and told them so, and later, for reasons of their own, they became disenchanted with the idea that they bought these assets and they wished to seek through their lawyers a way to exit from their responsibilities. . . .
>
> . . . [But], regardless of what the [parties to the contract] think, if the contract is not adequate to satisfy the Statute of Frauds or if the contract is a mere agreement to agree, then it's not a contract no matter what the participant businessmen may have thought at the time.

Looking only at the four corners of the Agreement, the district court held that it was not a binding contract, but rather a mere agreement to agree. The court noted that the Agreement made specific reference to several additional agreements required for consummation of the deal, that these agreements had never been executed, and that many material terms had been left open. In light of these facts, the court concluded that

despite the parties' subjective understanding that they had a contract, the Agreement did not evidence—objectively—an intent to be bound until all the parties' preliminary negotiations had been memorialized in a set of formal contracts. Because this set of formal contracts was never executed, the district court granted defendants' motion for summary judgment and dismissed the complaint.[3]

This appeal followed.

## DISCUSSION

### A. Applicable Legal Standards

#### 1. Standard of Review

█ In reviewing a district court's decision to grant summary judgment, our initial task is to determine whether the court below properly held that there were no genuine issues of material fact for trial. *See Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation*, 79 F.3d 1298, 1304 (2d Cir.1996). Examining the evidence in the light most favorable to the nonmoving party, we are to "apply a *de novo* standard of review to ensure that the substantive law was correctly applied." *Id.; accord Westport Bank & Trust Co. v. Geraghty*, 90 F.3d 661, 668 (2d Cir.1996); *Fund for Animals v. Babbitt*, 89 F.3d 128, 132 (2d Cir.1996).

#### 2. Preliminary Agreements

Parties to proposed commercial transactions often enter into preliminary agreements, which may provide for the execution of more formal agreements. When they do so and the parties fail to execute a more formal agreement, the issue arises as to whether the preliminary agreement is a binding contract or an unenforceable agreement to agree.

A framework under New York law[4] for analyzing the issue of whether a preliminary agreement is a binding contract or an unenforceable agreement to agree was articulated

---

**3.** Prior to the district court's ruling, defendants consented to the dismissal of their counterclaims with prejudice, subject to reinstatement in the event the district court denied their motion for summary judgment or plaintiffs successfully appealed from a decision granting the motion.

**4.** It is undisputed that New York law governs this action.

by Judge Leval in *Teachers Insurance & Annuity Association v. Tribune Co.*, 670 F.Supp. 491 (S.D.N.Y.1987), and applied by this Court in *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 71–72 (2d Cir. 1989). *See also Shann v. Dunk*, 84 F.3d 73, 77–78 (2d Cir.1996) (Leval, J.).

■ Ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract. *Shann*, 84 F.3d at 77; *see also R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir.1984) ("Under New York law, if parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs."). In some circumstances, however, preliminary agreements can create binding obligations. Usually, binding preliminary agreements fall into one of two categories. *See Arcadian*, 884 F.2d at 72; *Tribune*, 670 F.Supp. at 498.

■ The first is a fully binding preliminary agreement, which is created when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document. Such an agreement is fully binding; it is "preliminary only in form—only in the sense that the parties desire a more elaborate formalization of the agreement." *Tribune*, 670 F.Supp. at 498. A binding preliminary agreement binds both sides to their ultimate contractual objective in recognition that, "despite the anticipation of further formalities," a contract has been reached. *Id.* Accordingly, a party may demand performance of the transaction even though the parties fail to produce the "more elaborate formalization of the agreement." *Id.; see generally Arcadian*, 884 F.2d at 72–73.

■ The second type of preliminary agreement, dubbed a "binding preliminary commitment" by Judge Leval, is binding only to a certain degree. It is created when the parties agree on certain major terms, but leave other terms open for further negotiation. The parties "accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement." *Tribune*, 670 F.Supp. at 498. In contrast to a fully binding preliminary agreement, a "binding preliminary commitment" "does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the ... objective within the agreed framework." *Id.* A party to such a binding preliminary commitment has no right to demand performance of the transaction. Indeed, if a final contract is not agreed upon, the parties may abandon the transaction as long as they have made a good faith effort to close the deal and have not insisted on conditions that do not conform to the preliminary writing. *Id.*

■ Hence, if a preliminary agreement is of the first type, the parties are fully bound to carry out the terms of the agreement even if the formal instrument is never executed. If a preliminary agreement is of the second type, the parties are bound only to make a good faith effort to negotiate and agree upon the open terms and a final agreement; if they fail to reach such a final agreement after making a good faith effort to do so, there is no further obligation. Finally, however, if the preliminary writing was not intended to be binding on the parties at all, the writing is a mere proposal, and neither party has an obligation to negotiate further. *See Brause v. Goldman*, 10 A.D.2d 328, 199 N.Y.S.2d 606, 611 (1st Dep't 1960), *aff'd*, 9 N.Y.2d 620, 210 N.Y.S.2d 225, 172 N.E.2d 78 (1961).

■ Courts confronted with the issue of determining whether a preliminary agreement is binding, as an agreement of either the first or the second type, must keep two competing interests in mind. First, courts must be wary of "trapping parties in surprise contractual obligations that they never intended" to undertake. *Tribune*, 670 F.Supp. at 497; *accord Arcadian*, 884 F.2d at 72. Second, "courts [must] enforce and preserve agreements that were intended [to be] binding, despite a need for further documentation or further negotiation," for it is "the aim of contract law to gratify, not to defeat, expectations." *Tribune*, 670 F.Supp. at 498.

■ The key, of course, is the intent of the parties: whether the parties intended to be

bound, and if so, to what extent. "To discern that intent a court must look to 'the words and deeds [of the parties] which constitute objective signs in a given set of circumstances.'" *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.1986) (alteration in original) (quoting *R.G. Group*, 751 F.2d at 74). Subjective evidence of intent, on the other hand, is generally not considered. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1010 (2d Cir.1996).

## B. *Application*

In the present case, plaintiffs contend only that the Agreement was a preliminary agreement of the first type, a fully binding preliminary agreement. Plaintiffs allege that all of the material terms of the transaction were negotiated and incorporated into the two-page document and that there was nothing left to negotiate but the "legal phraseology." (Pl. Br. at 18–22). Hence, we limit our discussion to the first type of preliminary agreement—the fully binding preliminary agreement.[5]

The issue thus presented is whether, when the parties signed the Agreement, they had negotiated all the terms of the transaction and intended to be bound even if the additional documents referred to in the Agreement were never drafted and executed.

 We have identified four factors to be considered in determining whether the parties to a preliminary agreement that called for execution of a formal instrument intended to be bound in the absence of such an executed final instrument:

(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

*Winston v. Mediafare Entertainment Corp.*, 777 F.2d at 80 (applying factors to oral preliminary manifestation of assent); *see also Arcadian*, 884 F.2d at 72 (applying factors for second type of preliminary agreement to informal memorandum of understanding that called for negotiation and execution of formal sales agreement).[6]

### 1. *The Language of the Agreement*

 The first factor, the language of the agreement, is "the most important." *Arcadian*, 884 F.2d at 72. Here, the first factor strongly supports the conclusion that the Agreement was not a fully binding preliminary agreement. The Agreement does not expressly state that it was a binding agreement nor does it provide any express manifestation that the parties were bound by its terms. Rather, the document is entitled a "proposal" and it merely states that GAB "desires" to purchase assets and sets forth GAB's offer.

 Although the document contained a line for Adjustrite to sign to manifest its acceptance of the offer, the Agreement nowhere states that it became a binding agreement the moment it was signed. *Cf. Tribune*, 670 F.Supp. at 494, 499 (court held that parties' preliminary writing was binding where writing provided, "[u]pon receipt ... of an accepted counterpart of this letter, our

---

5. The parties did not explicitly discuss the differences between the two types of preliminary agreements. We note that the facts arguably could give rise to a claim by plaintiffs that the Agreement constituted the second type of preliminary agreement, a binding preliminary commitment, that defendants were obligated to make a good faith effort to reach a final agreement, and that defendants breached that obligation by "renouncing the deal [and] abandoning the negotiations." *Tribune*, 670 F.Supp. at 498. Plaintiffs made no such argument, however, either on appeal or in the district court. Moreover, the complaint did not allege the existence of such a preliminary agreement or the breach of any duty

to negotiate in good faith. Hence, such a claim is not before us now.

6. The factors to be considered in determining whether a "preliminary manifestation of assent" is a binding preliminary agreement of the second type are similar. *See Arcadian*, 884 F.2d at 72("(1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions") (citing *Tribune*, 670 F.Supp. at 499–503).

agreement to purchase from you and your agreement to issue, sell and deliver to us … the captioned securities, shall become a *binding agreement* between us") (emphasis added). To the contrary, the Agreement was expressly contingent, at least in part, "upon the execution of a sales agreement contract," and provided for the execution of "[s]taff position contracts." *Cf. Arcadian*, 884 F.2d at 72 (reference in memorandum to a binding sales agreement to be completed at some future date demonstrated defendant's intent not to be to be bound until that time); *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262 (2d Cir.) (reference in informal agreement to future formal agreement held to demonstrate intent of parties not to be bound), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984).[7]

### 2. *Partial Performance*

The second factor, partial performance of the contract, favors plaintiffs. Although the parties dispute the extent to which plaintiffs began performing for GAB, for purposes of this appeal from an order granting summary judgment for defendants, we resolve this factual dispute in favor of plaintiffs and assume that they partially performed their obligations under the contract.

### 3. *Open Items*

The third factor is the existence of open items, *i.e.,* whether any terms of the contract remained open to be negotiated. This factor weighs strongly in favor of defendants, for there remained numerous open items, including the following.

First, although the Agreement provided for the purchase of the Adjustrite–Motors license, the Agreement provided no details concerning the contemplated transfer. For example, it contained no representations concerning the scope or duration of the license and it made no provision for the possibility that Motors would not extend the license or agree to an assignment to GAB. *Cf. Tribune,*

670 F.Supp. at 499 ("There is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents."). Obtaining a long-term commitment from Motors was important to GAB, as the Adjustrite–Motors license was a year-to-year license that had to be renewed each year.

Second, although the Agreement provided for the "purchase" of Adjustrite's "proprietary software," it did not specify whether the transfer would include collateral rights, such as the copyrights to the software, nor did it address the issue of whether the software had been sold or licensed to anyone else.

Third, the Agreement purported to provide Orr and Elliott with five-year periods of employment, but it was not signed by Orr in his individual capacity and was not signed by Elliott at all. The Agreement did not include any provision for many of the terms usually found in an employment contract, such as a description of the employee's duties and responsibilities and termination, non-competition, and proprietary information provisions. *Compare Shann,* 84 F.3d at 78–79 (noting that "terms of an employment contract and noncompete agreement undoubtedly can be of great importance," but holding that the missing terms of consulting/noncompete agreement in question were unimportant because the allocation of a portion of payments to the consulting/noncompete agreement was a "fiction" intended to secure tax benefits).

In determining whether omitted terms are essential to a contract, New York courts adopt a flexible approach and look at the "broad framework" of a contract. *Id.* at 79. The broad framework of the contract here was that GAB was proposing to spend nearly a million dollars to acquire a computer program that was dependent on the database licensed from Motors. Without the Motors database and without full and exclusive

---

7. The fact that the Agreement contains no express reservation of the right not to be bound is not dispositive. A reservation of right not to be bound presumes that there is some expression of commitment or agreement in the writing to begin with, which, as already noted, is lacking here. As Judge Leval reasoned in *Tribune*, "a party that does not wish to be bound at the time of the preliminary exchange of letters can very easily protect itself by not accepting language that indicates a 'firm commitment' or 'binding agreement.'" 670 F.Supp. at 499.

rights to the Adjustrite software, the transaction would have been of little value to GAB. In addition, the employment agreements here were not a "fiction" as in the *Shann* case; GAB was agreeing to employ Orr and Elliott for five years each and therefore it was critical, from an objective point of view, that the rights and responsibilities of the parties be spelled out in writing. Hence, the omitted provisions were essential to the contract.

### 4. *Type of Contract*

The fourth and final factor is whether the Agreement is the type of contract that is usually committed to writing. Here, this factor also weighs strongly in favor of defendants. The transaction was a million-dollar acquisition. The principal assets being purchased were intellectual property—rights to software and a license to use a database. Five-year periods of employment were contemplated. In view of the size of the transaction, the nature of the assets being purchased, and the length of the contemplated employment contracts, the Agreement clearly was of the type that ordinarily would be committed not only to a writing but to a formal contract complete with representations and warranties and the other standard provisions usually found in sophisticated, formal contracts.

In sum, three of the four factors strongly point to the conclusion that the parties here did not intend to be bound until the formal documents were negotiated, executed, and delivered. The one factor that arguably supports a contrary conclusion—partial performance—is not sufficient to raise a genuine issue for trial, for no reasonable factfinder could conclude, on this record and in the face of the objective documentary evidence, that the parties agreed on all material elements of the transaction, intended to be fully bound when they signed the Agreement, and considered the formal sales agreement and employment contracts to be unnecessary formalities. *See Arcadian*, 884 F.2d at 72–73 (affirming grant of summary judgment dismissing breach of contract action even though there was "considerable partial performance," where language of memorandum showed that parties did not intend to be bound until final contract was signed); *Winston*, 777 F.2d at 83 (reversing district court and holding that parties were not bound to preliminary settlement agreement where three of four factors indicated parties did not intend to be bound until formal documents were executed and delivered and no such formal documents were ever finalized). Accordingly, the district court's grant of summary judgment was proper.

### CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.