Hyman GORODENSKY, H&H Warehousing Co., and the Estate of Harold Murawnik, Plaintiffs,

v.

MITSUBISHI PULP SALES (MC) INC., Defendant.

No. 96 Civ. 9758(MGC).

United States District Court, S.D. New York.

March 31, 2000.

John F. McHugh, McHugh & Sherman, P.C., New York City, for Plaintiffs.

Marshall Beil, Kenneth J. Rubinstein, Ross & Hardies, New York City, for Defendant.

## OPINION

CEDARBAUM, District Judge.

This is a breach of contract suit arising out of an alleged failure to satisfy the obligations of a letter of intent. Plaintiffs Hyman Gorodensky, H & H Warehousing Co. ("H&H"), and the estate of Harold Murawnik attempted, unsuccessfully, to establish a venture to build a manufacturing plant, operate the plant, and sell its output. Plaintiffs claim that defendant Mitsubishi Pulp Sales (MC) Inc. ("MPS") entered into a binding contract with them by signing a letter of intent to purchase all of the output of the proposed plant. The complaint alleges that MPS breached this contract by repudiation shortly after it was signed, and that the breach caused the venture to fail. Plaintiffs seek putative lost profits and other consequential damages, as well as damages for wasted time and effort invested in the project.

MPS moves for summary judgment on three grounds: first, that the letter of intent was not a binding contract; second, that even if a contract existed, it does not provide for lost profits as a remedy; and third, that even if MPS breached a binding contract, the breach did not cause plaintiffs' injuries. Plaintiffs also move for summary judgment on three grounds: first, that the letter of intent was a binding contract; second, that MPS breached the contract; and third, that there is no dispute as to the extent of plaintiffs' damages. At oral argument of these motions, I denied plaintiffs' motion as to the issues of breach and damages. I reserved decision on the issue of the existence of a contract and as to the entirety of MPS' motion. Because I find that there was no binding agreement between plaintiffs and MPS, MPS' motion is granted and the balance of plaintiffs' motion is denied.[1]

## THE UNDISPUTED FACTS

Hyman Gorodensky is a citizen and resident of Montreal, Canada. Prior to the transactions at issue in this case, Gorodensky's business consisted mainly of the purchase and sale of recycled materials, primarily textiles. Gorodensky was a partner, along with Harold Murawnik, of H & H, a family partnership. MPS is a New York corporation that is currently based in Chicago, Illinois. MPS sells pulp manufactured by others to paper mills.

Two types of pulp manufactured and sold in the paper industry are relevant to this case. Virgin pulp is pulp manufactured from wood. Deinked pulp is one

---

1. I do not address the remainder of MPS' motion since the contract issue is dispositive of the entire action.

form of pulp that is manufactured from recycled materials. As of 1993, MPS had extensive experience in the sale of virgin pulp in the United States and overseas but had never sold pulp made from recycled materials, including deinked pulp. Plaintiffs had no prior experience in manufacturing either virgin pulp or pulp made from recycled materials.

In early 1992, plaintiffs began to investigate the technical and environmental feasibility of setting up a venture to manufacture and sell deinked pulp. Plaintiffs owned two commercial rental buildings in an industrial section of Montreal, Canada. They proposed to convert these buildings into a facility to manufacture deinked pulp. This interest stemmed from the fact that, in 1991 and 1992, demand for pulp made from recycled materials was growing because regulations in the United States and Canada were increasingly requiring the use of recycled materials in the manufacture of paper.

After making a preliminary determination that the project was feasible, plaintiffs began to decline to renew tenants' leases in the two Montreal buildings, or to renew leases only for limited time periods. They also did not seek new tenants for those buildings. Their purpose was to make the buildings available for conversion to a pulp mill in the near future. In mid–1992, plaintiffs retained Dick Engineering to prepare a feasibility study of the proposed mill. The study, completed by September 1992, contains preliminary engineering design specifications, proposed technology to be used, specifications of the pulp to be produced, and estimated costs of the proposed facility.

After completion of the feasibility study, plaintiffs started to contact potential sources of raw materials and various Quebec governmental agencies. In March and April 1993, they obtained written expressions of interest in supplying waste paper from Perry S. Koplik & Sons, Inc. and D. Benedetto, Inc. Although plaintiffs' business plan described these letters as "letters of intent," Gorodensky testified that this was an error and that he never considered these letters as binding. Plaintiffs never entered into a contract with a supplier of waste paper.

Plaintiffs also received a letter in March 1993 from the Societe de Development Industriel Du Quebec ("SDI"), the economic development agency of the government of Quebec. The letter suggested that SDI might guarantee 50% of the possible loss a lender could incur in the project, dependent upon further review of plaintiffs' business plan and discussions with other government officials. Plaintiffs never forwarded a copy of their business plan to SDI or formally applied for a loan guarantee.

After completion of the feasibility study, plaintiffs met with Ted Homa, a marketing manager of Mitsubishi Canada Ltd. ("MCL") to discuss whether MCL would be interested in participating in the deinked pulp mill project. By March 15, 1993, MCL informed plaintiffs that it was interested in being a "turnkey contractor" for the project, meaning that it would build the pulp mill to agreed-upon specifications for a fixed price. However, MCL stated that it was not interested in operating or otherwise having a continuing investment or involvement in the pulp mill project. MCL's interest in the project was contingent on the securing of suitable financing by plaintiffs. In response to a request by plaintiffs, MCL provided a letter in July 1993 stating that MCL was interested in being the turnkey contractor for the project if plaintiff were able to secure term or project financing.

In early 1993, MCL contacted MPS to determine whether MPS would be interested in selling the output of the proposed pulp plant. MPS was enthusiastic about the project because MPS did not handle deinked pulp and wished to add a recycled product to its product line.

To assist in obtaining financing for the plant project, plaintiffs requested a letter of intent from MPS to purchase the output of the proposed facility. Negotiations be-

gan in April 1993 between plaintiffs and MPS. MPS signed the first version of the letter that month. A number of drafts were subsequently exchanged in which MPS incorporated plaintiffs' suggested revisions. One revision adjusted the language, upon plaintiffs' request, to state that MPS intended to purchase the output of the plant, rather than simply receive an option to purchase the output. Plaintiffs and MPS agreed to the final letter of intent, just over one page long, dated May 25, 1993 (the "Letter of Intent"). This letter is the subject of the present dispute.

The Letter of Intent states that MPS "inten[ds] to enter into a contract" for the "exclusive right and obligation" to purchase and sell the entire output of plaintiffs' plant for five years, "conditional on the output of the facility" meeting certain specifications outlined in the letter. The letter states that pulp would be "competitively priced, on a calendar monthly and quarterly basis, at levels mutually agreed upon." The letter does not state whether MPS would receive a commission for its sales or how the price paid by MPS for the plant's pulp would be determined. The letter concludes by stating that MPS is "looking forward to entering into detailed commercial discussions" with plaintiffs. It is signed by Stephen Rieu, MPS' Executive Vice–President, on behalf of MPS. It is not signed by any of the plaintiffs.

During the months following the date of the Letter of Intent, plaintiffs and MPS continued to correspond, though the nature of the correspondence is hotly disputed. In a June 22, 1993 letter, MPS notified plaintiffs that MPS was in the process of determining what kind of contract would be appropriate for their transaction. Plaintiffs claim that in a July 21, 1993 meeting, MPS breached the letter of intent by informing plaintiffs that MPS would not agree to any obligation to purchase the entirety of the mill's output. MPS claims that the July 21 meeting was part of a series of negotiations over the final structure of the agreement between MPS and plaintiffs.

In August 1993, MPS sent a six-page draft of a proposed contract to plaintiffs. This draft proposed an agency relationship between plaintiffs and MPS and suggested a 5% commission. Plaintiffs rejected the draft proposal. Plaintiffs never prepared a revised draft agreement for MPS to review or sign. However, in late September or October of 1993, plaintiffs proposed what the parties characterize as a "floor/ceiling" pricing arrangement which would set minimum and maximum pulp prices regardless of prevailing market prices for the purchase and sale of pulp. Plaintiff also offered MPS an equity stake in the proposed mill. MPS rejected these suggestions. MPS had never accepted such conditions in prior contracts.

The parties continued to negotiate through November 1993. For example, in letters dated October 18 and November 11, 1993, MPS stated that it still wished to form an agreement with plaintiffs but noted that there were numerous outstanding issues remaining to be addressed. In an October 25, 1993 letter, plaintiffs, through Gorodensky, responded that "[w]hile I do not agree with your characterization of a letter of intent, I do not think we need to quibble about it. We both want our deal to go forward in a mutually satisfying fashion." (Def.Ex. 15.) However, MPS and plaintiffs never resolved their differences.

From February 1993 through the end of the year, plaintiffs were also attempting to obtain financing for their project. The project's total cost was estimated at approximately CAN$50 million. Plaintiffs planned to contribute approximately CAN$10 million worth of property and funding. They thus needed to raise approximately CAN$40 million from outside sources to finance the project. Plaintiffs contacted a number of potential lenders and investors regarding financing the pulp mill project, including Canadian Imperial Bank of Commerce, Newcourt Capital, Inc., Republic Financial Corporation, the Bank of Montreal, Bank of America, and Toronto Dominion Bank.

In late 1993, plaintiffs were unable to make their mortgage payments for the properties on which the plant was to be built. Plaintiffs lost these properties to foreclosure, and went into bankruptcy shortly thereafter. Plaintiffs never obtained any financing for their project. The pulp plant was never built.

## DISCUSSION

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment .as a matter of law." Fed.R.Civ.P. 56(c). In determining whether the moving party has met this burden, the Court must resolve all ambiguities in favor of the party opposing the motion. Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Put differently, summary judgment should be granted where the "record as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see also 3Com Corp. v. Banco do Brasil,* 171 F.3d 739, 743 (2d Cir.1999).

The question of whether a binding contract exists is one of law that is appropriately decided on a motion for summary judgment. *Shann v. Dunk,* 84 F.3d 73, 77 (2d Cir.1996); *Mallad Construction Corp. v. County Federal Savings and Loan Association,* 32 N.Y.2d 285, 291, 298 N.E.2d 96, 100, 344 N.Y.S.2d 925, 930 (1973). It is undisputed that New York law governs this action. Plaintiffs argue that the Letter of Intent was intended to constitute a binding contract between plaintiffs and MPS. MPS argues that the Letter of Intent was only a preliminary understanding that contemplated further negotiations.

"Ordinarily, preliminary manifestations of assent that require further negotiation and further contracts do not create binding obligations." *Shann,* 84 F.3d at 77. "[I]n some rare instances, if a preliminary agreement clearly manifests such intention, it can create binding obligations." *Id.* However, "[a] primary concern for courts ... is to avoid trapping parties in surprise contractual obligations that they never intended." *Teachers Ins. & Annuity Ass'n v. Tribune Co.,* 670 F.Supp. 491, 497 (S.D.N.Y.1987).

The Second Circuit analyzes the enforceability of preliminary agreements under New York law using the framework devised by Judge Leval in *Tribune. See Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 71–72 (2d Cir.1989). Under this framework, there are two types of binding preliminary agreements. The first type is a fully binding preliminary agreement, which is created "when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document." *Adjustrite Sys., Inc. v. GAB Business Servs., Inc.,* 145 F.3d 543, 548 (2d Cir. 1998). Such an agreement is binding just as if it were a formalized agreement, since it contemplates the signing of a more elaborate contract only as a mere formality. *Tribune,* 670 F.Supp. at 498. The second type is a "binding preliminary commitment," which is created "when the parties agree on certain major terms, but leave other terms open for further negotiation." *Adjustrite,* 145 F.3d at 548. Parties to this type of agreement "accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement." *Tribune,* 670 F.Supp. at 498. A party to such an agreement "has no right to demand performance of the transaction." *Adjustrite,* 145 F.3d at 548.

The parties' intention to be bound by a preliminary agreement of the first type is determined by examining (1) the language of the agreement; (2) the existence of open terms; (3) whether there

has been partial performance; and (4) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions. *Id.* at 549. Determining the parties' intention to be bound by a preliminary agreement of the second type requires consideration of these same four factors, along with one additional factor, the context of the negotiations resulting in the preliminary agreement. *Id.* at 549 n. 6.

Plaintiffs contend that the Letter of Intent was an agreement of the first type, arguing that "[t]he letter had to be and was intended to be a binding and firm commitment to purchase all of the [plaintiff's] conforming pulp."[2] (Pl. Reply Mem. at 2.) However, the Letter of Intent does not bear the indicia of a binding preliminary agreement.

The first factor, the language of the agreement, is "the most important." *Arcadian*, 884 F.2d at 72. The language of the Letter of Intent shows that MPS did not intend the letter to be a binding agreement. The subject of the letter is "Letter of Intent to Purchase De–Inked Pulp." The letter states that MPS "is prepared to enter into a commercial agreement" to purchase plaintiffs' pulp and that "it is our intent to enter into a contract." The letter goes on to state that "[o]ur intent is conditional upon" the facility's output meeting a number of technical requirements and assumes that "all quality and logistical questions can be satisfactorily addressed." Importantly, the letter concludes "[w]e are looking forward to entering detailed commercial discussions as soon as practicable." All of these statements show that MPS intended the letter to be exactly what it was titled, a letter of intent, and not a binding commitment. *See Adjustrite*, 145 F.3d at 548–50.

Furthermore, there is nothing in the Letter of Intent to suggest that plaintiffs intended to be bound by it. In *Tribune*, Judge Leval noted that "a party that does not wish to be bound at the time of the preliminary exchange of letters can very easily protect itself by not accepting language that indicates a 'firm commitment' or 'binding agreement.'" 670 F.Supp. at 499. The corollary to this statement is that a party that does wish to be bound can protect itself by insisting on such language. *See, e.g., id.* at 494, 499 (holding that preliminary writing was binding where it provided that "[u]pon receipt . . . of an accepted counterpart of this letter, our agreement to purchase from you and your agreement to issue, sell and deliver to us . . . the captioned securities, shall become a binding agreement between us"); *Keis Distribs., Inc. v. Northern Distrib. Co.*, 226 A.D.2d 967, 968–69, 641 N.Y.S.2d 417, 419–20 (App. Div.3d Dep't 1996) (holding preliminary writing binding where it directed plaintiff "to accept this offer by signing below" and suggested retaining counsel to work out the "wording of the final details").

Here, plaintiffs suggested, and obtained, various revisions to the letter, but did not negotiate for language stating a clear commitment by either themselves or MPS. Plaintiffs were not obligated to build the pulp plant. Nor were they obligated to provide MPS with the exclusive right to the plant's output. Accordingly, the language of the Letter of Intent does not evidence an intent by either side to be bound by its terms. *See Arcadian*, 884 F.2d at 72.

The second factor, the existence of open terms, also shows that the letter was not a binding agreement. There were a number of open terms remaining to be negotiated. The letter noted that MPS' intent to enter into a contract with plaintiffs was based on the condition "that all quality and logistical questions can be satisfactorily addressed." More importantly, the price term remained to be negotiated. The only reference to the price MPS would pay for the plant's output was a statement that the

---

**2.** Notably, plaintiffs are seeking damages for lost future profits, a remedy unavailable for breach of a duty to negotiate in good faith. *See Goodstein Constr. Corp. v. City of New York*, 80 N.Y.2d 366, 375, 604 N.E.2d 1356, 590 N.Y.S.2d 425 (1992).

pulp "will be competitively priced, on a calendar monthly and quarterly basis, at levels mutually agreed upon."

Plaintiffs argue that this was a sufficiently specific price term, as market price in the pulp industry can be easily determined. However, the letter did not specify what discount or commission MPS would receive for its pulp purchases. This was a necessary term because MPS was not an ultimate buyer of the pulp but rather only a "pulp agent" which was to resell the pulp to buyers, in place of plaintiffs' developing a marketing and sales infrastructure of its own.

 Furthermore, plaintiffs themselves demonstrated that the price term was not sufficiently definite when they continued to negotiate the price through September, 1993. Their suggestion of a pricing system involving floor and ceiling prices, and its rejection by MPS, is an indication that the vague sentence on price in the Letter of Intent did not reflect an agreement on that term. "Changes requiring revision of the agreement typically result in a finding that there was no complete contract.... Once the price bec[omes] uncertain, the contract bec[omes] devoid of a critical term." *Cleveland Wrecking Co. v. Hercules Constr. Corp.*, 23 F.Supp.2d 287, 297 (E.D.N.Y.1998); *see also Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 82–83 (2d Cir.1985); *Tribune*, 670 F.Supp. at 499 ("There is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents."). Accordingly, the second factor also weighs against finding a binding agreement.

 The third factor, partial performance, is not helpful because the Letter of Intent envisioned future performance. Defendants could not purchase pulp, and plaintiffs could not deliver it, until the plant was built, so neither party could perform its alleged duties during the time period in question. "Partial performance requires some actual performance of the contract." *P.A. Bergner & Co. v. Martinez*, 823 F.Supp. 151, 157 (S.D.N.Y.1993). Furthermore, "partial performance of the contract must secure a benefit to the other party to be enforceable." *Id.* Nothing plaintiffs did after receiving the Letter of Intent, even if it could be characterized as performance under an alleged agreement, benefitted MPS. Thus, this factor does not favor plaintiffs.

The remaining factors—the context of the negotiations and the necessity of a formal agreement—weigh in favor of MPS. This transaction was to be a five-year commitment for the purchase of a pulp plant's total output which was to be worth millions of dollars. However, the Letter of Intent is slightly over a page long, and signed only by MPS. "In view of the size of the transaction, the nature of the [transaction], and the length of the contemplated ... contract[ ], the Agreement clearly was of the type that ordinarily would be committed not only to a writing but to a formal contract complete with representations and warranties and the other standard provisions usually found in sophisticated, formal contracts." *Adjustrite*, 145 F.3d at 551. Nothing about the context of the negotiations suggests that the parties intended to memorialize their agreement in so brief and incomplete a form.

No reasonable finder of fact could conclude, based on the above factors, that plaintiffs and MPS intended to be bound by the Letter of Intent. The first factor alone supports this conclusion as a matter of law. Accordingly, the Letter of Intent is not an enforceable contract.

## CONCLUSION

For the foregoing reasons, MPS' motion for summary judgment is granted. Plaintiffs' motion for summary judgment is denied.

SO ORDERED.