COLLOTON, Circuit Judge,
dissenting.
I agree with the, court’s articulation of New York law with respect to preliminary agreements. A Type I agreement “arises when the parties agree on all the points that require negotiation” and permits parties to demand performance of the transaction, and a Type II agreement “establishes a framework for agreement, and binds the parties to negotiate in good faith within that framework.” Ante at 464 (quoting Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc., 295 F.Supp.2d 1063, 1065 (D.Minn.2003)). I respectfully dissent, however, because I do not believe the undisputed facts demonstrate as a matter of law that Mesaba breached a Type II agreement, and because even assuming the existence of a Type II agreement, it does not give FLI a right to demand that Mesa-ba execute long-term airplane leases worth millions of dollars. The court does not rely on FLI’s principal argument that the “Term Sheet Proposal” is a binding Type I agreement as a matter of law, and I also find that contention unpersuasive. In reaching my conclusion, I bear in mind that “[ojrdinarily, preliminary manifestations of assent, that require further negotiation and further contracts do not create binding obligations,” Shann v. Dunk, 84 F.3d 73, 77 (2d Cir.1996), and that a court should find a binding contractual obligation only in “rare instances,” where a preliminary agreement “clearly manifests” such an intention. Id.
A Type II agreement merely “binds the parties to negotiate in good faith,” and I believe that determining whether such an agreement was breached in this case requires resolution of factual disputes. Questions of good faith are “notoriously inappropriate” for resolution at summary judgment, Krishna v. Colgate Palmolive Co., 7 F.3d 11, 16 (2d Cir.1993), and here, I think there is enough evidence from which a jury could infer Mesaba’s good faith throughout the negotiation process to create a genuine issue of material fact. FLI’s former CEO acknowledged that the parties “diligently set out to negotiate” and participated “to the bést of their ability.” (Appellant’s App. at 71, 73). That the parties reached agreement on short-term leases while they negotiated further supports an inference that they were engaged in the negotiation process with a good-faith intent to reach agreement on longer-term leases. To be sure, FLI argues that Me-saba breached its obligations of good faith by insisting on terms that were outside the Term Sheet and refusing to sign long-term leases until its new demands were met. But I believe such factual disputes regarding Mesaba’s good faith during the negotiation process are properly resolved by a jury in this case, and not on summary judgment.
Furthermore, even if Mesaba has breached a Type II agreement, such an agreement “does not commit parties to their ultimate contractual objective,” and “[a] party to such a binding preliminary commitment has no right to demand performance of the transaction.” Adjustrite Sys., Inc. v. GAB Bus. Servs., 145 F.3d 543, 548 (2d. Cir.1998) (internal quotations omitted). “Indeed, if a final contract is not agreed upon, the parties may abandon the transaction as long as they have *469 made a good faith effort to close the deal and have not insisted on conditions that do not conform to the preliminary writing.” Id. If the evidence demonstrates breach of a Type II agreement, then FLI is not entitled to relief as though the parties ultimately had reached the long-term airplane lease agreement toward which they had agreed to negotiate. See also Goodstein Constr. Corp. v. City of New York, 80 N.Y.2d 366, 590 N.Y.S.2d 425, 604 N.E.2d 1356, 1360-61 (1992).
Although FLI devotes the great majority of its argument to defending the district court’s conclusion that the Term Sheet constitutes a Type I agreement under New York law, the court does not rely at all on this proposition. There are “two distinct types” of preliminary contracts with binding force, Teachers Ins. and Annuity Ass’n of Am. v. Tribune Co., 670 F.Supp. 491, 498 (S.D.N.Y.1987), and the court implicitly rejects FLI’s position concerning a Type I agreement by concluding that the Term Sheet constitutes a Type II preliminary binding commitment to negotiate in good faith. While the multi-factor analysis prescribed by New York law is hardly precise, I ultimately conclude that the four factors relevant to the analysis of this preliminary agreement — the agreement’s language, the existence of open terms, the parties’ partial performance, and whether this type of agreement usually is committed to writing — weigh in favor of finding that the parties did not intend for the Term Sheet to be binding as a Type I airplane lease agreement.
FLI contends that the parties, through the Term Sheet Proposal, agreed to a mul-ti-million dollar airplane lease contract. This undoubtedly is the sort of agreement that usually is committed to writing, and it is undisputed that the Term Sheet lacks the written detail and specificity typical of an airplane lease agreement.
The language of the “Term Sheet Proposal” itself also suggests that it amounts to something less than a formal airplane lease agreement. The document is entitled a “proposal,” see Adjustrite Systems, 145 F.3d at 549, not a “Term Sheet Contract,” as FLI refers to the document throughout its brief. The proposal identifies its own effect more narrowly than FLI urges. In the paragraph headed “EFFECT OF THIS TERM SHEET,” the agreement reads: “By signing this Term Sheet, SAAI, FLI and Mesaba evidence their agreement to negotiate, execute, and deliver definitive documentation in substantially the form and substance of the 2/18/96 drafts of the above-listed documents no later than April 15, 1996.” (Add. at 25). To my mind, the relevant verbs— “to negotiate, execute, and deliver” — contemplate more than mere scrivener’s work. The language suggests that there are terms yet to be settled between the parties, and the contemplation of further negotiation tends to show that the parties had not reached a complete agreement. A Type I agreement, by contrast, occurs when “parties have reached complete agreement ... on all the issues perceived to require negotiation,” and “more elaborate formalization” is “not necessary,” but “merely considered desirable.” Tribune Co., 670 F.Supp. at 498; see also Adjustrite Sys., Inc., 145 F.3d at 547-48 (applying Tribune Co. and acknowledging that it articulated the “framework” for analyzing preliminary agreements under New York law).
The parties’ subsequent performance similarly suggests that the Term Sheet was a preliminary agreement that was not intended to be binding as an airplane lease contract. Although the court quotes the district court’s conclusion that Mesaba accepted delivery of 23 aircraft “using only the Term Sheet,” ante at 466, the parties *470 in fact executed separate short-term subleases covering those aircraft. These short-term leases do not refer to the Term Sheet, and many of them say that they “constitute[ ] the entire agreement between the parties.” The lease terms of the short-term leases do not match the proposed terms in the Term Sheet, further suggesting that the parties were not carrying out lease obligations pursuant to the Term Sheet.
That separate short-term leases were necessary is not surprising. The Term Sheet itself is silent with respect to many issues that one would expect to find in a lease agreement, including maintenance obligations, insurance, stipulated loss values, and return conditions. While these matters may not be the most important terms in an airplane lease agreement, I do not share the view that they are immaterial. These open terms again suggest that the Term Sheet was not meant to be a binding lease agreement, but rather a “framework for agreement” within which the parties were bound to stay.
For these reasons, I would hold that the record fails to establish a binding Type I agreement as a matter of law, and remand the case for further proceedings on the question whether Mesaba breached a Type II agreement to negotiate in good faith within the framework of the Term Sheet Proposal.