[15 NE3d 329, 991 NYS2d 574]

IDT Corp. et al., Respondents, v Tyco Group, S.A.R.L., et al., Appellants.

Argued April 29, 2014; decided June 5, 2014

**POINTS OF COUNSEL**

*Dewey Pegno & Kramarsky LLP*, New York City (*Thomas E.L. Dewey* of counsel), for appellants. I. This Court's opinion ended this case. (*MHR Capital Partners LP v Presstek, Inc.*, 12 NY3d 640; *Merritt Hill Vineyards v Windy Hgts. Vineyard*, 61 NY2d 106; *HGCD Retail Servs., LLC v 44-45 Broadway Realty Co.*, 37 AD3d 43; *N.F.L. Ins. Ltd. by Lines v B & B Holdings, Inc.*, 874 F Supp 606; *Rotella v Rotella*, 178 AD2d 755; *Hall v People to People Health Found., Inc.*, 493 F2d 311; *Colonial Pac. Leasing Corp. v Brown*, 28 Misc 3d 1214[A], 2010 NY Slip Op

51322[U]; *Preferred Mtge. Brokers v Byfield*, 282 AD2d 589; *Stanton v Power*, 254 AD2d 153; *Levy v Friedman*, 216 AD2d 18.) II. Plaintiffs' complaint is barred by res judicata and collateral estoppel. (*Matter of Hunter*, 4 NY3d 260; *Matter of Reilly v Reid*, 45 NY2d 24; *Sandhu v Mercy Med. Ctr.*, 54 AD3d 928; *Baldo v Marine Midland Bank*, 219 AD2d 807; *Smith v Russell Sage Coll.*, 54 NY2d 185; *Elias v Rothschild*, 29 AD3d 448; *NAS Electronics, Inc. v Transtech Electronics PTE Ltd.*, 262 F Supp 2d 134; *Dorli, Inc. v RGA Accessories*, 136 AD2d 465; *Aviles v Liberty Mut. Ins. Co.*, 300 AD2d 70; *Sterngass v Soffer*, 27 AD3d 549.) III. The documentary evidence establishes that plaintiffs' complaint fails. (*Beal Sav. Bank v Sommer*, 8 NY3d 318; *O'Donnell, Fox & Gartner v R-2000 Corp.*, 198 AD2d 154; *Beattie v Brown & Wood*, 243 AD2d 395; *Mode Contempo, Inc. v Raymours Furniture Co., Inc.*, 80 AD3d 464; *Venture Assoc. Corp. v Zenith Data Sys. Corp.*, 96 F3d 275; *Ga Nun v Palmer*, 202 NY 483; *Tenavision, Inc. v Neuman*, 45 NY2d 145; *Allbrand Discount Liqs. v Times Sq. Stores Corp.*, 60 AD2d 568; *Rachmani Corp. v 9 E. 96th St. Apt. Corp.*, 211 AD2d 262; *Dingley v Oler*, 117 US 490.)

*Robins, Kaplan, Miller & Ciresi L.L.P.*, New York City (*Hillel I. Parness, Richard A. Mescon* and *Oren D. Langer* of counsel), for respondents. I. Plaintiffs have alleged facts sufficient to support their claims for breach of contract and breach of the duty to negotiate in good faith. (*Lawrence v Graubard Miller*, 11 NY3d 588; *Quesada v Global Land, Inc.*, 35 AD3d 575.) II. Plaintiffs have sufficiently pleaded claims for breach of contract and breach of the duty to negotiate in good faith, and nothing defendants raise in their opening brief changes that. (*MHR Capital Partners LP v Presstek, Inc.*, 12 NY3d 640; *Teachers Ins. & Annuity Assn. of Am. v Tribune Co.*, 670 F Supp 491; *HGCD Retail Servs., LLC v 44-45 Broadway Realty Co.*, 37 AD3d 43; *Merritt Hill Vineyards v Windy Hgts. Vineyard*, 61 NY2d 106; *N.F.L. Ins. Ltd. by Lines v B & B Holdings, Inc.*, 874 F Supp 606; *Perna v Desai*, 101 AD2d 857; *Rotella v Rotella*, 178 AD2d 755; *Snakepit Auto., Inc. v Superformance Intl., LLC*, 19 Misc 3d 1114[A], 2008 NY Slip Op 50683[U]; *Levy v Friedman*, 216 AD2d 18; *Stanton v Power*, 254 AD2d 153.)

## OPINION OF THE COURT

Smith, J.

For the last 15 years, the parties to this case have alternately negotiated and litigated over the development and use of a

telecommunications system. This lawsuit is the second to come to us in which IDT Corp. claims that Tyco International, Ltd. breached its obligation under a 2000 settlement agreement to negotiate additional agreements in good faith. In the previous lawsuit, we held IDT's claim to be unsupported by the record (*IDT Corp. v Tyco Group, S.A.R.L.*, 13 NY3d 209, 215 [2009]). More negotiations took place after our decision, and IDT sued Tyco again in 2010.

We again reject IDT's claim. Parties who agree to negotiate are not bound to negotiate forever. It is clear on this record that the parties have reached an impasse and that IDT has no valid cause of action.

I

The relationship between the parties goes back at least to 1999, when IDT and Tyco (terms we use to include the parent corporations, IDT Corp. and Tyco International, Ltd., and their subsidiaries and affiliates) signed a memorandum of understanding relating to a joint venture that would develop an undersea fiber optic telecommunications system. Three lawsuits arising out of this proposed transaction were brought in 2000, and were settled by a Settlement Agreement dated October 10, 2000. Two later lawsuits, the one we decided in 2009 and the one we decide today, arose out of the Settlement Agreement.

As we explained in our earlier opinion:

> "The settlement agreement, among other things . . . called for Tyco to provide IDT with an 'indefeasible right of use' (IRU) of certain fiber optic capacity free of charge for a 15-year period. The capacity was to be on Tyco's TyCom Global Network (TGN), a subsea cable system planned to connect North America, Asia and Europe. At the time of the settlement, the TGN was not yet constructed. The agreement states that '[t]he IRU shall be documented pursuant to definitive agreements to be mutually agreed upon and, in any event, containing terms and conditions consistent with those described herein.' These further definitive agreements, and the IRU, were to be in writing and consistent with Tyco's standard agreements with similarly situated customers. Tyco's standard agreements were not in existence at the time the settlement was made" (*IDT Corp.*, 13 NY3d at 212 [footnote omitted]).

In a round of negotiations stretching from 2001 to 2004, the parties failed to reach the "definitive agreements" by which the IRU was to be "documented." In the course of the negotiations, Tyco proposed terms that were, in IDT's view, inconsistent with the terms of the Settlement Agreement. We said in our previous opinion, summarizing the record before us: "Negotiations continued to be active, but flagged after a sharp drop in the market greatly reduced the value of the capacity Tyco had agreed to supply. The negotiations finally came to an end in March 2004" (*id.*). IDT sued Tyco in May of that year.

We affirmed a grant of summary judgment dismissing IDT's 2004 complaint. We agreed with IDT that the 2000 Settlement Agreement "was a fully enforceable contract" (*id.* at 213), but held that Tyco's obligation under that contract to furnish IDT with capacity was subject to conditions—most important among them the negotiation and execution of the IRU—that were never met. We recognized the parties' obligation "to negotiate the terms of the IRU and other agreements in good faith" (*id.* at 214), but held that Tyco had not breached its obligation merely by proposing (as distinct from insisting upon) terms allegedly inconsistent with the Settlement Agreement. We concluded that "the record does not support a finding that Tyco breached any of its obligations" (*id.* at 215).

Five weeks after our decision, counsel for IDT sent a letter to Tyco demanding that Tyco "immediately comply with [its] obligations" under the 2000 Settlement Agreement by providing fiber optic capacity to IDT. Tyco replied that it had no further obligations under the Settlement Agreement—a position that it reaffirmed several times in the following months—but nevertheless agreed to negotiate. This round of negotiations was no more successful than the previous one, and IDT brought the present case in November of 2010, asserting separate causes of action for breach of contract and for breach of Tyco's duty to negotiate in good faith.

IDT's new complaint recounts a series of written and oral communications between IDT and Tyco in 2009 and 2010. This narrative concludes with the allegation that in an October 13, 2010 telephone conversation:

> "Tyco continued to insist on terms that conflicted with the Settlement Agreement and made a definite and final communication to IDT of Tyco's intent to forgo its obligations under the Settlement Agreement, including its obligation to provide to IDT the

use of the Wavelengths described in the Settlement Agreement for fifteen years and in a manner fully consistent with that described in the Settlement Agreement."

The complaint is not more specific about what Tyco representatives allegedly said on October 13. The only document in the record that purports to summarize the October 13 conversation is an email sent the following day by Tyco's counsel. The email does not support the complaint's description of the conversation; it neither makes any nonnegotiable demands nor suggests that Tyco is unwilling to continue negotiating.

On Tyco's motion pursuant to CPLR 3211, Supreme Court, interpreting our previous decision to mean "that Tyco has no further obligations under the Settlement Agreement," dismissed IDT's 2010 complaint for failure to state a cause of action (2011 NY Slip Op 33843[U], *6 [2011]). The Appellate Division reversed, concluding that Tyco's "obligations . . . did not have an expiration date" and that "the parties were obligated to continue to negotiate until either side insisted that the open terms be as set forth in [Tyco's] standard agreements" (*IDT Corp. v Tyco Group, S.A.R.L.*, 104 AD3d 170, 176 [1st Dept 2012]). The Appellate Division also held that "the defendants' statements that they had no further obligations to negotiate" were "an anticipatory breach of the contract" (*id.* at 176-177), and that the result of the previous action did not bar IDT's present claims under the doctrine of res judicata or collateral estoppel (*id.* at 178). Two Justices concurred in the result, agreeing that our decision in the previous action did not bar the present one and finding IDT's allegation, quoted above, that Tyco had insisted on terms in conflict with the Settlement Agreement to be sufficient "at this pre-discovery stage of the proceeding" to withstand a motion to dismiss (*id.* at 179 [Friedman, J., concurring]).

The Appellate Division granted Tyco leave to appeal, certifying to us the question of whether its order was properly made (2013 NY Slip Op 74325[U] [2013]). We answer in the negative, reverse and reinstate Supreme Court's dismissal of the complaint.

## II

As our 2009 decision makes clear, parties may enter into a binding contract under which the obligations of the parties are conditioned on the negotiation of future agreements. In such a

case, the parties are obliged to negotiate in good faith. But that obligation can come to an end without a breach by either party. There is such a thing as a good faith impasse; not every good faith negotiation bears fruit. As then-District Judge Leval explained in *Teachers Ins. & Annuity Assn. of Am. v Tribune Co.* (670 F Supp 491, 505 [SD NY 1987]):

> "[I]f, through no fault on either party, no final contract were reached, either because the parties in good faith failed to agree on the open secondary terms, or because, as often happens in business, the parties simply lost interest in the transaction and by mutual tacit consent abandoned it without having reached final contract documents, no enforceable rights would survive based on the preliminary commitment." (*See also Adjustrite Sys., Inc. v GAB Bus. Servs., Inc.*, 145 F3d 543, 548 [2d Cir 1998] [if the parties "fail to reach . . . a final agreement after making a good faith effort to do so, there is no further obligation"]; *Snakepit Auto., Inc. v Superformance Intl., LLC*, 19 Misc 3d 1114[A], 2008 NY Slip Op 50683[U], *5 [Sup Ct, Nassau County 2008] [finding that the parties "have negotiated in good faith" but "were unable to reach an agreement"].)

Tyco says that in this case its obligation to negotiate came to an end in 2004. It relies on our 2009 decision, and the facts underlying it, as establishing that the negotiations reached impasse, or were abandoned by both parties, in 2004, without bad faith on Tyco's part at least.

We did indeed hold in 2009 that IDT had failed to show bad faith by Tyco. We also said that, after adverse developments in the marketplace, negotiations "flagged" and "finally came to an end in March 2004" (13 NY3d at 212). IDT is technically correct that this last statement does not bind it as a matter of res judicata or collateral estoppel; whether the negotiations had "finally" ended in 2004 was not directly in issue in the earlier case. Our statement that they did end then, however, was supported by the record before us, and no fact alleged by IDT in the present case is inconsistent with it.

But even on the assumption that Tyco's obligation under the 2000 Settlement Agreement to negotiate additional agreements in good faith still existed in 2009-2010, IDT's complaint does not sufficiently allege any breach of the obligation. It is true, as the concurring Justices in the Appellate Division

pointed out, that courts normally give a generous reading to pleadings that are attacked as insufficient on their face. But it is not too much to ask that a pleading filed after more than a decade of back and forth between the parties contain some specific facts supporting the claim of bad faith—not just the bald conclusions, contradicted by the only relevant document referred to, that Tyco insisted "on terms that conflicted with the Settlement Agreement" and "made a definite and final communication" of its intent to violate its obligations.

While some specific details of the 2009-2010 negotiations are contained in IDT's 2010 complaint, none of them, in our view, support an inference that Tyco failed to negotiate in good faith. IDT seems to rely heavily on Tyco's repeated insistence, while continuing to negotiate with IDT, that it was not bound by the 2000 Settlement Agreement to do so. But this mere statement of Tyco's legal position—whether or not the position was meritorious—is not in itself a refusal to negotiate.

Accordingly, the order of the Appellate Division should be reversed, with costs, the order of Supreme Court reinstated, and the certified question answered in the negative.

PIGOTT, J. (dissenting). While I agree with the majority that parties may sometimes reach an "impasse" during contract negotiations (majority op at 500), neither party claims that is what happened here. Rather, IDT alleges that Tyco insisted that it had no obligation to negotiate and when Tyco did entertain negotiations, it did so in bad faith. Tyco admits that it took the position that it had no obligation to negotiate after this Court's 2009 decision. Because Tyco had not been discharged of its obligations, either by this Court's 2009 decision or by operation of law, I would affirm the order of the Appellate Division.

The obligation for Tyco to supply IDT with the wavelengths capacity arises out of the parties "valid settlement agreement" from 2001 (*IDT Corp. v Tyco Group, S.A.R.L.*, 13 NY3d 209, 214 [2009]). In 2009, this Court held that IDT could not be successful on a claim for an anticipatory breach of the agreement for Tyco's failure to turn over the wavelengths because the terms of that turnover were not yet completed and, at that juncture, there was no record support for the claim that Tyco had acted in bad faith during the negotiations of the turnover (*id.* at 214-215). We did not say, contrary to Tyco's interpretation of our decision, that the parties were no longer bound to negotiate the terms of the turnover contemplated by the agreement. Rather, we expressly recognized that additional good faith

negotiations were to proceed as required by the settlement agreement (*id.* at 214 ["under the settlement agreement, the parties were required to negotiate the terms of the IRU and other agreements in good faith"]).

The current lawsuit concerns Tyco's actions, and inaction, after our 2009 decision. While the majority criticizes the lengthy history of the parties' dispute and IDT's failure to include more documentary support for its allegation (*see* majority op at 503-504), this is a pre-pleading CPLR 3211 motion to dismiss the complaint. IDT was simply required to state a valid cause of action and, in my view, it did.

Judges READ, RIVERA and ABDUS-SALAAM concur with Judge SMITH; Judge PIGOTT dissents in an opinion in which Judge GRAFFEO concurs; Chief Judge LIPPMAN taking no part.

Order reversed, with costs, order of Supreme Court, New York County, reinstated and certified question answered in the negative.