[939 NYS2d 298]

ROSE GROUP PARK AVENUE LLC et al., Respondents, v NEW YORK STATE LIQUOR AUTHORITY, Appellant. THE PRESERVATION COALITION et al., Intervenors-Appellants.

First Department, January 19, 2012

### APPEARANCES OF COUNSEL

*Eric T. Schneiderman, Attorney General*, New York City (*Monica Wagner* and *Richard Dearing* of counsel), for New York State Liquor Authority, appellant.

*Kurzman Karelsen & Frank, LLP*, New York City (*Charles Palella, Phyllis H. Weisberg* and *Marissa Winter* of counsel), for Preservation Coalition and George Davis, intervenors-appellants.

*Davis Wright Tremaine LLP*, New York City (*Victor A. Kovner, Lacy H. Koonce, III* and *Monica Pa* of counsel), for respondents.

### OPINION OF THE COURT

CATTERSON, J.

In this CPLR article 78 proceeding, petitioner Rose Group Park Avenue, a special events catering company, challenges respondent State Liquor Authority's (SLA) denial of its application for a liquor license for regularly scheduled events in a church located in midtown Manhattan. We find that Rose Group's catering facility in the Third Church of Christ, Scientist at Park Avenue and 63rd Street fails to meet the statutory requirements governing the "church venue" exception of the Alcoholic Beverage Control Law. For the reasons set forth below, we find, therefore, that SLA's denial of the catering license was not arbitrary and capricious.

The undisputed salient facts are as follows: In January 2006, the Church, facing major budget deficits, entered into an agreement with tenant Rose Group, a commercial caterer, for a 20-year lease on the premises with two five-year renewal options. The lease provides for an annual rent of $250,000 in the first year escalating to $519,732 in the last year. Additionally, the Church receives 10% of gross sales of Rose Group's business where gross sales exceed the annual rent. Under the terms of the triple net lease, Rose Group also pays the property taxes and charges for utilities and services.

The lease further provides that Rose Group as tenant "shall use and occupy the [p]remises solely as a high end, first class catering facility and for banquets, special events and meetings, all of which may include the preparation and service of food and alcoholic and non-alcoholic beverages."

The church is located 60 feet from another church, the Central Presbyterian Church. This brings it within the ambit of the Alcoholic Beverage Control Law's 200-foot rule which prohibits the issuance of a permanent liquor license for any premises located within 200 feet of a building occupied exclusively as a school or place of worship. (*See* Alcoholic Beverage Control Law § 64 [7] [a].)

However, a 1970 amendment to the law created an exception known as the church venue exception which states in relevant part that the 200-foot rule should not be deemed "to restrict the issuance of . . . a caterer's license to a person *using the permanent catering facilities of a church . . .* or other place of worship pursuant to a written agreement between such person and the authorities in charge of such facilities." (Alcoholic Beverage Control Law § 64 [7] [c] [emphasis added].)[1] Pursuant to the terms of the lease, Rose Group applied for a caterer's license, also known as a liquor license.

Rose Group's first application in 2006 disclosed that its location of operations was Third Church and moreover that it was located 200 feet from Central Presbyterian. The SLA conditionally approved the application, but withdrew the approval in October 2007 after the Department of Buildings withdrew an occupancy permit for the premises. Rose Group reapplied for a catering license in May 2009. A neighborhood group, the Preservation Coalition (hereinafter referred to as the Coalition) opposed the application and a hearing was held by the SLA. At the hearing, Rose Group argued that it was exempt because its catering facilities constitute the permanent catering facilities of the Third Church.

The SLA denied its application on the grounds, inter alia, that "Rose Group is not using the permanent catering facility of a church . . . . Rather, the Rose Group has transformed the premises from a church into an extravagant commercial catering business in a building it leases from a church." SLA

---

1. The generally accepted wisdom, gleaned from contemporaneous memoranda, correspondence and the Bill Jacket, as to the initial impetus for passing such exception holds that it was a way to accommodate church functions like weddings, or christenings where liquor could be served.

concluded that "based on the dramatic changes to the building done at Rose Group's expense . . . combined with the large number and types of functions taking place inside the building, this building has lost its primary use as a place of worship."

In December 2009, Rose Group commenced an article 78 proceeding in Supreme Court challenging the SLA's determination as arbitrary and capricious. The Coalition moved, without objection, to intervene. The SLA and the Coalition asserted that the premises had not maintained the predominant character of a house of worship, but had been converted to a de facto catering establishment, thus failing to fall within the church venue exception.

In April 2010, Supreme Court reversed and vacated SLA's determination, granted the petition and ordered the SLA to issue the catering license. Supreme Court observed that SLA's determination requiring a nexus between the catered functions and the place of worship is not supported by either "[l]egislative history or by [the law's] plain meaning." The court also found that the provision permits use by Rose Group even though there is no nexus between the events and the church because "use of the building by non-congregant members of the community for private social functions" (Alcoholic Beverage Control Law § 64 [7] [d-1]) does not detract from its predominant character as a place of worship. The court additionally found that 583 Park Avenue had not ceased to be exclusively occupied as a place of worship because "it appears that the Church uses the [p]remises many more hours per week for church-related activities than for unrelated catering events."

█ The court misread the statutory scheme. Its analysis focused on a vague and imprecise calculation of usage hours rather than on the clear statutory requirements that catering events must be "incidental uses that are not of a nature to detract from the predominant character of the building as a place of worship" (Alcoholic Beverage Control Law § 64 [7] [d-1]). The court also ignored the principle that statutory interpretation by SLA is entitled to deference unless the interpretation is "irrational or unreasonable." (*Matter of Fineway Supermarkets v State Liq. Auth.*, 48 NY2d 464, 468 [1979].)

It is undisputed that the Central Presbyterian Church—located 60 feet from the subject Church—has the predominant character of a church thus implicating the 200-foot rule. This prohibits Rose Group from obtaining a catering license unless it can show that under the church venue exception, it is using the

"permanent catering facilities of a church." (*See* Alcoholic Beverage Control Law § 64 [7] [c].) The SLA correctly determined that the catering facilities at 583 Park Avenue are neither permanent nor do they belong to the church as required by the statute.

As a threshold matter, it is not necessary to look beyond the plain language of the statute. Indeed, Rose Group concedes that point, arguing that "[w]here a statute is unambiguous, a court or agency should not reach beyond its plain language to find some unexpressed alternative meaning." (*See also Sega v State of New York*, 60 NY2d 183, 190-191 [1983] ["a statute is to be construed according to the ordinary meaning of its words"].) Unfortunately, Rose Group does not adhere to this principle, but thereupon segues into an argument that "permanent catering facilities *of* a church" means "catering facilities permanently *installed in* a church *building*" (emphasis added). This, of course, is nothing more than a highly transparent attempt to find an unexpressed alternative meaning which more closely suits its purpose. Clearly, had the Legislature wanted to specify "*in a church building*," it could have easily done so.

Rose Group's attempt to change the wording from "of" to "in" indicates that it understands the distinct and material difference between the two words: "Of" connotes a possessory or ownership interest, and generally establishes a relationship between the object owned and the entity owning it; "in," on the other hand, simply describes the situate or location of an object. Moreover, as SLA correctly asserts, "church" cannot refer simply to the building because that construction would exclude a church's catering facilities in, for example, a church hall, which the exception was expressly intended to include. (*See* Alcoholic Beverage Control Law § 64 [7] [c].) To construe the word "church" merely as a building rather than the religious organization or body that worships in the building would essentially reference only a style of architecture.

Thus, we find that "of a church" requires a showing that the catering facilities belong to the religious organization, that is they were created and installed for it, or, at the very least, are used by church members. The catering facilities at issue include a banquet hall/ballroom, a balcony overlooking the banquet hall/ballroom, a cocktail reception area, a full commercial banquet and prep kitchen, upgraded restrooms, a VIP/bridal suite, a wine cellar/storage area, and upgraded wiring, lighting and acoustics.

It is undisputed that Rose Group has spent millions of dollars installing catering facilities throughout the Church. It is also undisputed that the Church did not own any catering facilities until Rose Group installed them. There was no kitchen on the premises, much less a full commercial kitchen like the one installed by Rose Group. There was no banquet hall or ballroom until Rose Group created a public event space with carpeting, lighting, acoustics and the requisite decor and dance floor. There was no VIP/bridal suite.

However, none of these catering facilities were installed for the Church's use. The public event space/auditorium is used as a ballroom or banquet hall only by Rose Group; otherwise it is set up for Church use as a sanctuary. The lease makes it clear that Rose Group's renovation and upgrading work which includes the installation of kitchen equipment and of the VIP suite was "to accommodate [Rose Group's] catering business."

Notwithstanding Rose Group's declarations that the Church owns the facilities "now and in perpetuity," there is no provision in the lease that reflects current or future Church ownership of the catering facilities. Indeed, the lease, to the contrary, states that upon expiration or termination of the lease, Rose Group "shall remove all of its property."

Equally significant is that the lease does not even permit the Church to use the catering facilities. There is no provision in the lease that contemplates the Church setting up its own tables and chairs in the banquet hall, or using the kitchen equipment or kitchen area. Notwithstanding the affidavit of Jacqueline Draper, the Church's Chairman of the Board of Trustees, in which she stated that the Church "expect[s] to use the kitchen to prepare food for various Church events," there is no provision in the lease that would allow such use. On the contrary, in the second amendment to the lease, executed in March 2007, paragraph two specifically provides that Rose Group will cater 20 Church functions at cost; and over and above that number will cater Church functions at a ten percent discount off Rose Group's standard fees.

Nor, under the terms of the lease, does the Church retain any option to contract with another entity to cater a church function. For example, if the Church perceived the cost of Rose Group's catering to be too high, even at cost, it does not have the option of entering into an agreement with any other caterer which it could do if the facilities indeed belonged to, or were "of the Church."

Nor are the catering facilities "permanent" as required by the church venue exception. The most visible component of the facilities, the banquet hall/ballroom, the arcade and the balcony, become a sanctuary when used by the Church. It is true that the church pews have been removed from this area. However, following any Rose Group event, tables and chairs and setting stations must be removed and stored. Plastic folding chairs are then arranged for use by the congregation. Thus, what is now described as an auditorium is sometimes the ballroom or banquet hall, and sometimes the sanctuary. The SLA, therefore, rationally determined that "[t]his constant rotation of the building's setup from church to banquet hall renders nothing permanent about this facility."

Equally without merit is Rose Group's contention that there is no requirement of a nexus between a catered event and the Church. The court below focused on the Legislature's apparent rejection of the SLA's objection at the time of passage of the legislation. That objection stated, in relevant part, that

> "[t]he bill does not require the caterer, when licensed, to confine his catering operation to affairs sponsored by the school, or house of worship nor to affairs related to their activities. Once licensed by the Authority, the law permits him to lawfully conduct his business in a manner most profitable to him and he may, if he chooses, cater affairs entirely unrelated to the activities of schools or houses of worship."

Consequently, the court interpreted the church venue exception as permitting a catered event that is unrelated to the activities of a church. In turn, Rose Group states baldly: "So long as a catering facility is housed in a church building and there is a written agreement between a caterer and church authorities, the [c]hurch-[v]enue [e]xception applies."

This interpretation, of course, would render impossible any attempt to harmonize subdivisions of the same section of the Alcoholic Beverage Control Law. Instead, it would allow the incongruous result that while any commercial enterprise within a 200-foot radius of the Church would be refused a liquor license, the Church itself could rent out its space to that same commercial enterprise which could serve liquor to guests under the church venue exception.

In any event, it is no longer necessary to guess at the Legislature's intent as to the church venue exception. That

intent was made clear enough with the passage of a 2007 amendment to the Alcoholic Beverage Control Law. (*See* § 64 [7] [d-1].) The amendment codifies a holding of the Court of Appeals which held that certain activities can take place in a church without the building losing its predominant character as a place of worship, and thus without losing the protection of the 200-foot rule. (*Matter of Fayez Rest. v State Liq. Auth.*, 66 NY2d 978 [1985].)

The amendment, in relevant part, states that a church "does not cease to be 'exclusively' occupied" as a church because of "incidental uses that are not of a nature to detract from the predominant character of the building as a place of worship." (*See* Alcoholic Beverage Control Law § 64 [7] [d-1].) It is generally accepted that the exclusivity language applies also to the church venue exception. Although Rose Group appears to disagree with this assertion, it would simply make no sense that a building, rendered ineligible for protection under the 200-foot rule because it has engaged in activities that detract from its predominant character as a place of worship, would nevertheless remain eligible for the benefits of the church venue exception.

The amendment, in any event, is relied on both by the court below, and on appeal by Rose Group in support of its argument that a nexus is not required between a catered event and the place of worship. Rose Group points to the amendment's lengthy, though not exclusive, list of the types of events that may be considered valid "incidental uses." Specifically, it points to the last enumerated use, that is, "use . . . by non-congregant members of the community for private social functions." (Alcoholic Beverage Control Law § 64 [7] [d-1].) However, to rest the argument on one enumerated use is to ignore the statutory requirement contained in the sentence preceding the list which is that the use must be "incidental" and that "incidental use" may not "detract from the predominant character of the building as a place of worship." (Alcoholic Beverage Control Law § 64 [7] [d-1].)

The plain meaning of this statutory requirement is that any single incidental use whether it be "legally authorized games of bingo" or use "by non-congregant members of the community for private social functions" may not render the building unrecognizable as a place of worship either before, during or after the event. Even were we to agree that the last enumerated use be given the widest and most lax interpreta-

tion, as Rose Group urges ("community" refers to the New York community of executives, lawyers and fashonistas), the documentary evidence establishes that the events staged by Rose Group are neither "incidental use" of the premises, nor of such nature that they do not detract from the predominant character of the building as a place of worship.

The record contains calendars of the events scheduled by Rose Group between September 2007 and December 2009. In terms of volume, they numbered 38 in the last four months of 2007, 53 in 2008 (an average of more than four per month) and 67 in 2009 (more than five a month). They included fully-catered corporate functions for Wall Street executives, banks, law firms, publishing companies, and fashion houses with the latter involving the staging of runway shows. The best view of such catered events is to be found by "Googling" 583 Park Avenue, the address of the Church. The first Web site on the list is "583parkave.com." It contains almost 100 photographs from a variety of elegant "black-tie" events on the premises. They show the lobby, a cocktail reception area, the banquet hall with dance floor, tables with immaculate white linen tablecloths set with silverware, crystal stemware and exotic centerpieces, and setting stations decorated with elaborate ice sculptures. The written descriptions refer to the premises as "the most exciting event space" or "one of Manhattan's most distinctive private event spaces." There is a reference to "grandly elegant proportions designed by architects Delano and Aldrich."[2] The descriptions also include references to the ballroom and the arcade reception space (shown in the record as floor plans), to a 2,500-pound crystal chandelier (seen in many of the photos), to vaulted ceilings, herringbone cork floors, concert hall quality acoustics and a "state of the art kitchen operated by a family with generations of experience in providing the highest quality food and service."

Nothing suggests that the "space" doubles as a Church. None of the photos conveys any suggestion that the building has been used, or is still used as a place of worship. It could not be said of a single scheduled event that it does not detract from the predominant character of the building as a place of worship.

---

**2.** William Adams Delano and Chester Holmes Aldrich formed one of the most successful architectural firms of the early 20th century. In New York, the firm rivaled that of the legendary McKim, Mead & White. In my view, Delano and Aldrich are spinning in their respective graves over the conversion of their soaring house of worship masterpiece into a pedestrian catering facility.

This alone would be sufficient to find that Rose Group's uses of the premises fail to comply with the statutory requirement, but additionally this Cinderella-style transformation does not end at the stroke of midnight; even when the catered event is over, the building's predominant character does not revert to that of a place of worship as it was prior to the execution of the lease with Rose Group.

Pursuant to the lease, Rose Group removed all the church pews for the duration of the 20-year lease and for the periods of renewal. Following each event, Rose Group is required only to set up plastic folding chairs for the congregants. Hence, depending on the time of day, there may either be plastic folding chairs set up for the congregation in the sanctuary/ballroom, or Rose Group employees may be setting up tables and chairs for a catered event later in the evening. Rose Group, under the terms of the lease, has been permitted to install curtains to conceal the church's organ pipes. It is also permitted to conceal any religious messages inside the sanctuary. Moreover, a visitor wandering into the church would be greeted not by a church custodian, but by a doorman hired by the Rose Group. On the lower level, Rose Group's kitchen staff works on the preparation of food and beverages for hours prior to the scheduled event.

On the exterior of the building, the lease has permitted Rose Group to "install a sign above the center doorway of the center front of the [b]uilding identifying it as '583 Park Avenue' " where previously signs and lettering on the front pillars and over the main door identified the building as the Third Church of Christ Scientist. It should be noted here that the Court of Appeals in *Fayez Rest.* specifically held that a neighborhood church qualified as "exclusively occupied" because, inter alia, "[o]utside the building is a sign stating it is the home of New York Christian Outreach." (*Fayez Rest.*, 66 NY2d at 979.)

The lease further allows Rose Group to "remove or cover . . . the existing signs on the building facade and replace or cover them with blank ('faux') windows" and to "install . . . a blank piece of limestone or limestone veneer over the engraved lettering over the front pillars." Although Rose Group is obligated to install two electronic signs on the corners of the building, one on 63rd Street, which will indicate the existence of a Sunday school and church, those signs, controlled from an office on the premises will be switched off "when [Rose Group] is using the [p]remises for a third-party function or [even] marketing the [p]remises."

Hence, whether the building is being used incidentally for a catered event or not, its character can no longer be described as predominantly that of a place of worship. On the contrary, the provisions of the lease have permitted the building to be so altered that little remains as evidence of its use as a place of worship.

The contention that square footage used by the Church establishes a predominant use as a place of worship is without merit. In this case, the square footage used exclusively by the Church encompasses a 4th floor area reserved for Church offices and classes, and a corner of the basement, now reserved for Sunday school and a nursery. Nor can an analysis based on usage hours by the Church establish predominant character or use. In *Fayez Rest.*, the Court included "daily worship" as a factor in determining exclusivity of occupation. (*Fayez Rest.*, 66 NY2d at 979.) In this case, however, there is no *daily* worship, only twice-weekly services with two extra services on Christmas Eve and Thanksgiving. Also, any finding of predominant use based on hours would have to take into account the hours spent by Rose Group preparing for a catered event on the premises, not just the hours of the event itself. Work on the premises by Rose Group clearly involves setup and breakdown of the banquet hall and cocktail area. It includes the arrangement of tables and chairs, setting stations and decorations such as centerpieces/flowers for each table, not to mention the setting of silverware and stemware. Rose Group's use of the premises also involves the preparation of food, at times for up to 1,000 guests, and the subsequent cleanup of the banquet hall and kitchen.

Finally, Rose Group's catered events cannot be characterized as "incidental uses" where the generally accepted meaning of incidental is subordinate or nonessential. On the contrary, under the triple net lease, Rose Group events are essential because the material terms of the lease require Rose Group to pay rent and make additional payments based on gross revenues from its use of the building "as a first-class catering facility."

Far from being a subordinate use of Church property, Rose Group events take priority over Church events. It is simply an error for the court below to find a predominant Church use on the grounds that Rose Group events are scheduled "when they do not conflict with the Church's own activities." That observation ignores the fact that Church activities are strictly limited by the lease. The Church's use is limited to specific designated times: Sunday mornings; Wednesday evenings; Christmas Eve;

and Thanksgiving. Church association meetings are "not to exceed four (4) in any calendar year" and must be held on the specific dates referenced in the lease unless the Church gives Rose Group "not less than *one (1) year's prior written notice* of any such change in the date" (emphasis added). In the event the Church may want to schedule an additional service, meeting or church activity, the Church is required to consult with Rose Group in order "to schedule such meetings (i) in a manner *which causes no disruption* to [Rose group's] scheduled events in the [p]remises and (ii) at *such times as do not conflict with [Rose Group's] reasonably anticipated* use of the [p]remises" (emphasis added).

Indeed, Rose Group's statement in an initial private offering memorandum hews most closely to the reality that the company has entered into a lease with the church "which *permits* the current congregation to use the [f]acility [s]pace on a limited basis at times when *the [c]ompany is not using* the [f]acility [s]pace" (emphasis added). Thus, the Church's use is subordinate to Rose Group's use according to the plain language of the lease which reflects simply that Rose Group has established a catering business in a building it has leased from the Church.

Accordingly, the judgment of the Supreme Court, New York County (Barbara R. Kapnick, J.), entered April 19, 2010, granting petitioners-plaintiffs' motion to the extent of reversing and vacating the determination of respondent-defendant the State Liquor Authority, issued on or about December 2, 2009, which denied petitioner-plaintiff Rose Group Park Avenue LLC's application for an Alcoholic Beverage Control retail license, and directing the Authority to issue the license, and denying that portion of intervenors-respondents' motion seeking to deny the petition and complaint and dismiss this hybrid CPLR article 78 and 42 USC § 1983 proceeding, should be reversed, on the law and the facts, without costs, the determination of the State Liquor Authority reinstated, and the proceeding dismissed.

TOM, J.P., SAXE, MOSKOWITZ and MANZANET-DANIELS, JJ., concur.

Judgment, Supreme Court, New York County, entered April 19, 2010, reversed, on the law and the facts, without costs, the determination of the State Liquor Authority reinstated, and the proceeding dismissed.