## Places in Saratoga, LLC v Izzo

2024 NY Slip Op 32940(U)

August 21, 2024

Supreme Court, Saratoga County

Docket Number: Index No. EF20202/9482

Judge: Richard A. Kupferman

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

STATE OF NEW YORK
SUPREME COURT     COUNTY OF SARATOGA

---

**PLACES IN SARATOGA, LLC,**

Plaintiff,

-against-

**FRANK J. IZZO, SYLVIA J. IZZO, and
73 HENRY STREET LLC,**

Defendants.

**DECISION & ORDER**

Index No.: EF20202948

---

Appearances:

Javier J. Mendez, Esq.
Lemery Greisler LLC
677 Broadway, 8th Floor
Albany, New York 12207
*Attorneys for the Plaintiff*

Brian D. Casey, Esq.
Cabaniss Casey LLP
4 Tower Place, Suite 100
Albany, New York 12203
*Attorneys for the Defendants*

KUPFERMAN, J.,

This action involves a dispute between adjoining landowners in the City of Saratoga Springs. The plaintiff alleges that the rainwater from the roof of the defendants' building has been flowing onto its building and entering through its walls. The plaintiff seeks millions of dollars in damages, as well as injunctive relief. Shortly after commencing this action, the plaintiff previously sought partial summary judgment. This Court previously denied the prior motion, finding that issues of fact existed for trial. Now, several years later, the plaintiff makes this second motion seeking partial summary judgment.

1

## Background

The individual defendants first acquired their parcel with another person in 2004. They later became the sole owners in 2006.[1] Their parcel is approximately 2,400 square feet, running along Caroline Street for approximately 33 feet and along Henry Street for approximately 72 feet. It has two street addresses, namely, 47 Caroline Street and 73 Henry Street. In 2008, the same grantors (Joseph R. Nemec and George R. Nemec) later transferred the adjoining parcel, 79 Henry Street, to the plaintiff's predecessor, which apparently acquired the parcel for development. In 2013, the plaintiff's owner allegedly invested in the development project with a builder. The parcel was then transferred into the plaintiff's name.

The plaintiff's parcel is much larger than the defendants' parcel, being approximately 8,700 square feet. The land runs along Henry Street, at a width of approximately 60 feet, and then extends all the way to Pavilion Place, approximately 191 feet. The width of this parcel narrows at three points on its way to Pavilion Place, decreasing to approximately 50 feet at the end of the western property line of 73 Henry Street, then to approximately 43 feet at the end of the western property line of 43 Caroline Street (Clancy's Tavern), and then to approximately 39 feet at approximately 91 feet away from Pavilion Place.

At the time of the transfers, the two parcels each contained a two-story building (apparently built more than a century ago), which were separated by a significant gap of several feet (perhaps 10 feet). Within the space between these two buildings, there was a one-story structure attached to the wall of the defendants' building. While the defendants' building still exists (and is being

---

[1] In 2021, the individual defendants transferred the parcel to the defendant LLC, which is owned by them.

used as a restaurant and for other tenants), the plaintiff has since demolished the existing structures on its property to construct a new building to be used for office and retail space.

The plaintiff's new building (three stories) was designed to be built on its property line, without a setback. Based on the architectural drawings, the new building was designed to extend along its property line for approximately 60 feet on Henry Street and for apparently 100 feet westward towards Pavilion Place, including along its shared border with 73 Henry Street (approximately 33 feet). The project also runs along the property line for other neighboring parcels on Caroline Street, including another property owned by the individual defendants through an LLC ("45 Caroline Street").

The new building's design includes a three-story enclosed stairway where the previous one-story structure existed, leaving only a small gap between the parties' buildings (a gap of approximately 4 inches). This enclosed stairway (also referred to as the lobby) sits within a rectangular enclave abutting the defendants' north wall (in an area of approximately 9.56 feet by 33 feet). This design, which leaves a very small gap between the buildings, creates the potential for rainwater and snow melt to enter the gap, especially as the roof of the defendants' building slopes towards the plaintiff's property.

The defendants contend that the roof of their building has always slanted from the south to the north and dispersed water in the same manner as it does today. The defendants contend that the water has drained in this manner for decades, including under the prior ownership. The water simply flowed from the roof of 73 Henry Street onto the one-story structure previously located at 79 Henry Street. The defendants further dispute that they made any improvements that altered the flow of the water. Although the defendants admittedly had a gutter installed along the north wall of their roof at some point after acquiring their property, they contend that the gutter was removed

by the plaintiff (or the plaintiff's agents) without their permission and that the gap between the two buildings is too small to reinstall the gutter.

The plaintiff's architect asserts that the new building's design anticipated that rainwater runoff could potentially impact the new building. To address the potential for water runoff into the small gap, the original design drawings show a detail that involved a flashing. The detail apparently included a metal flashing, although it was unclear to the contractor (project manager) whether the metal flashing was designed to extend from the plaintiff's building to the defendants' building or vice versa.

Prior to construction, the plaintiff's contractor reached out to one of the defendants ("Mr. Izzo") to discuss the water runoff issue and other issues related to the construction. The early negotiations/discussions lasted for several months and involved several individuals, including the plaintiff's owner, the contractor, the plaintiff's architect (Michael Tuck), Mr. Izzo, his attorney (John Cromie), and his architect (Les Ackerman). Among other things, the negotiations concerned the need for the contractor to access the defendants' properties to perform the excavation and related work, the impact of the construction on Mr. Izzo's building, the design and cost of a system to control the water runoff from the defendants' roof, the cost involved to make improvements to the defendants' building, and the cost of future repairs and maintenance.

During these discussions, the contractor was confronted with the problem of the sewer line for the defendants' properties running through 79 Henry Street, a matter that may not have been considered by the planning board during the site plan review process. The plaintiff moreover needed to relocate this sewer line to proceed with the construction design. One of the defendants' buildings (47 Caroline Street) had a recorded agreement to use this sewer line. Another building

4

of the defendants (45 Caroline Street) also used this sewer line, although the defendants could not locate any recorded easements authorizing such use.

During the negotiations, the parties discussed the allocation of responsibility for hiring workers to perform the proposed improvements and the cost associated with making the improvements to the defendants' roof. Early in the negotiations, the plaintiff asserted that the defendants should pay half of the cost for the roof drainage system and half of the cost to relocate the sewer line. The plaintiff proposed a design for a roof drainage system that would cost $4,500 and offered to pay no more than $2,250 towards this expense. The plaintiff also offered to pay $6,477 to furnish and install an underground storm drain. The plaintiff further proposed that the defendants should be responsible for retaining the contractors to perform the work.

The construction progress reports from early 2018 reflect that the contractor was seeking to obtain a memorandum of understanding ("MOU") from each of the affected building owners prior to proceeding with the construction. The contractor's progress reports, as well as the affidavits submitted on the pending motion, reflect that the contractor provided the MOU to Mr. Izzo to sign; that Mr. Izzo provided the MOU to his attorney to review; that the contractor was waiting for Mr. Izzo to sign the MOU; and that Mr. Izzo never signed the MOU (although a different MOU was apparently signed during this time for the limited purpose of finding the sewer lines used by Mr. Izzo's buildings).

The plaintiff nonetheless alleges that the parties reached a verbal agreement on the design for the roof drainage system at a meeting on May 25, 2018. The defendants dispute that any such agreement existed. Regardless of what transpired, the contractor's notes and the correspondence indicate that the negotiations deteriorated in or around June 2018. In July 2018, the plaintiff's attorney submitted a revised proposal, which included, among other things, an offer by the plaintiff

5

to pay for the entire cost to relocate the sewer line. As part of the proposal, the plaintiff's attorney clarified that the plaintiff would require the parties' agreement to be memorialized by a formal written agreement. The plaintiff's attorney further provided the defendants' counsel with a draft petition for judicial relief pursuant to RPAPL 881.

In August 2018, the plaintiff's attorneys filed the petition against the defendants (as well as another owner of a neighboring property on Caroline Street), seeking to obtain relief pursuant to RPAPL 881. Among other things, the plaintiff sought an Order from the Court granting it the following: a temporary license to access the defendants' properties to perform the construction activities; permission to relocate the sewer line servicing 47 Caroline Street; and permission to disconnect 45 Caroline Street from the sewer line. The plaintiff did not request any relief regarding the roof drainage issue, although the defendants raised the issue in their answering papers in responding to the allegations.

On November 5, 2018, the plaintiff and Mr. Izzo (both represented by counsel) appeared before the Court and stipulated to the settlement of the court proceeding. Numbers 1-5 of the stipulation authorized the relocation of the sewer line at the plaintiff's cost and permitted the plaintiff to temporarily access the defendants' properties to perform excavation and related work. Number 6 required the plaintiff to pay and arrange for an inspection of the defendants' north wall by a structural engineer to determine and opine about certain protective measures necessary to protect the wall during the construction of the new building. Number 7 of the stipulation required the parties to "enter into discussions as to the nature, scope and parties' respective responsibility for the [protective] measures." Pursuant to Number 7, such measures were to include "the design of and construction at Petitioner's sole cost and expense of a rainwater catchment system" and the granting of a permanent easement in favor of the defendants for draining the water flow from the

6

defendants' roof to Pavilion Place. Further, Number 8 required the defendants to execute a document confirming the termination and abandonment of any prior sewer easements running through 79 Henry Street that they had for their buildings.

These provisions read, as follows:

> "Number 6. Additionally, Petitioner at [its] sole cost and expense shall arrange for an inspection of the north or rear wall of 47 Caroline Street by a structural engineer to determine and opine to the measures, and we're calling those the protected measures, to be undertaken to appropriately protect this wall during construction of the new building at 79 Henry Street.
>
> Number 7. Upon receipt of the structural engineer's report and before any construction is undertaken of the new building the Petitioner and Izzo shall **enter into discussions as to the nature, scope and parties' respective responsibility for the protected measures**. Such measures will necessarily include the design of and construction **at Petitioner's sole cost and expense** of a rainwater catchment system to receive runoff from the rooms of 49 - I'm sorry -- from the roofs of 47 Caroline and the new building and the **granting of a permanent easement** in favor of Izzo for 47 Caroline to receive that water flow through its drainage systems running to Pavilion Place.
>
> Number 8. Promptly **after agreement upon** and completion of **the parties of their respective responsibilities or the protective measures**, the Respondents shall execute an instrument in recordable form acceptable to Petitioner's attorneys in all respects confirming termination, abandonment of any and all sewer and related utility easements in favor of Respondents' properties extending across or otherwise burdening 79 Henry Street and agree that upon an unreasonable delay by Respondents in executing and delivering the termination, Petitioners may apply to the Court on notice to Respondents for an order confirming such termination, abandonment thereof (emphasis added)."

Following the stipulation, the plaintiff arranged for and paid for a structural engineer (Biggs) to determine the protective measures to protect the north wall during the construction ("Biggs' report"). The parties further conducted a meeting on April 3, 2019. The plaintiff alleges

7

in a very general manner that Mr. Izzo agreed at the meeting to use the plaintiff's design for the system. The defendants dispute this.

After the April 3, 2019 meeting, the plaintiff's attorneys further prepared a draft Easement and Settlement Agreement (dated April 2019), which concerned (according to the plaintiff) "issues that were not otherwise resolved by the Stipulation of Settlement" (Amended Complaint, Paragraph 37). This draft agreement sets forth various terms on several issues, including the nature, scope, and responsibility of the parties for improvements to the defendants' building. Among other things, the draft agreement includes terms regarding the installation on the defendants' roof of a specific rainwater catchment system. Notably, this portion of the draft agreement expressly provides that such improvements were not required by the stipulation of settlement (see Draft Agreement, Section 2.A).

The proposed Statement of Material Facts prepared by plaintiff's attorney states that "Izzo did not accept the proposed Easement and Settlement Agreement" (Statement of Material Facts, Number 45). The parties nonetheless executed and filed an instrument confirming the termination and abandonment of any prior sewer easements through 79 Henry Street, as required by the stipulation. The plaintiff further relocated the sewer line at its cost (allegedly $75,000) and gained temporary access to the defendants' property to perform its work, as required under the stipulation.

At some point, repairs were made to the defendants' north wall; a five-inch gutter on the roof of the defendants' north wall was removed; and the three-story stairway was constructed within approximately four inches from the defendants' north wall, without any final written agreement in place for the rainwater catchment system.[2]

---

[2] A disagreement exists over who removed the gutter. The plaintiff alleges that the defendants' masons may have removed the gutter, whereas the defendants allege that the plaintiff's agents removed the gutter without their permission.

8

In December 2019, the defendants filed a motion with this Court (under the 2018 index number) seeking settlement of the stipulation based on a finding in the Biggs' report that the height of the new three-story building would cause increased drifted snow buildup on the roof of the defendants' (two-story) building. The motion essentially sought to compel the plaintiff to pay for improvements to the defendants' roof to eliminate the possibility of the collapse of the roof from the extra stress of snow-load caused by the height of the new building.

In January 2020, this Court denied the defendants' motion "for the reasons set forth in Petitioner's Opposition."[3] In a subsequent decision in June 2021, the Court clarified its holding, concluding that the "plaintiff lacks any financial responsibility to improve defendant's roof." Simply stated, the plaintiff could not be compelled based on the stipulation to reinforce the defendants' roof from additional snow loads. The Court, however, did not hold that the parties could not negotiate over snow-related issues impacting the roof and the drainage system.

The record reflects that the parties thereafter continued to discuss the nature, scope, and responsibilities regarding the rainwater catchment system. Since then, the plaintiff has continued to discuss/propose various designs, including designs from its architect dated May 24, 2018, April 10, 2019, and December 18, 2019. The defendants have raised several concerns with the designs, including, among other things, the additional cost required by them for repairs and maintenance, the cost of the repairs to the roof necessary to install the plaintiff's design, and the potential for the failure of the proposed system from differential settlement. The defendants have further accused the plaintiff of selecting an inferior design to simply save its own costs. The defendants' architect

---

[3] In its opposition papers, the plaintiff asserted that the collapse and drainage issues from the additional snow load were a mere possibility and therefore too premature to adjudicate; that it never agreed to pay for improvements to reinforce the defendants' roof from any additional snow load; and that the motion was procedurally improper, among other things.

9

has further recommended the use of a parapet. While the plaintiffs' project manager has allegedly considered this as a good option, the plaintiff (through its contractor) has insisted on the defendants providing the designs and performing the work necessary to install the system.

In this action (commenced in November 2020), the plaintiff contends that the defendants have failed to act in good faith during their performance of the stipulation and, additionally, that they are committing a tort by failing to manage the stormwater runoff from their roof. The plaintiff contends that the defendants' failure to install a stormwater management system on its roof constitutes negligence and that their failure to prevent the stormwater from entering the gap between the two buildings creates a nuisance and trespass.

At the outset of the action, the plaintiff unsuccessfully sought partial summary judgment (liability) on its nuisance, trespass, and injunction claims. The learned justice assigned to the case at the time denied the motion on the merits, finding that the affidavit from the defendants' expert created a triable issue of fact based on his identification of alternate sources for the water infiltration. The expert opined that the water infiltration occurring at 79 Henry Street is due to: (1) improper design and analysis of the new building; (2) wind-swept rain; (3) the intrusion of sub-surface water; and (4) an improperly created concrete gutter on the ground between the two buildings. Now, after discovery, the plaintiff again seeks partial summary judgment (liability) on the trespass and nuisance claims, as well as on its contract (duty of good faith) and negligence claims.

## Summary Judgment Standard

"Summary judgment is a drastic remedy and should not be granted unless there are no triable issues" (Michaelis v State of New York, 135 AD2d 1005, 1006 [3d Dept 1987]). The movant bears the initial burden of demonstrating "entitlement to judgment as a matter of law by

10

proffering evidentiary proof in admissible form" (DiBartolomeo v St. Peter's Hosp. of the City of Albany, 73 AD3d 1326, 1326 [3d Dept 2010]; see CPLR 3212 [b]). If the moving party meets this initial burden, the burden then shifts to the party opposing the motion to raise a triable issue of fact (see DiBartolomeo, 73 AD3d at 1326). "The evidence must be viewed in the light most favorable to the nonmovant, and that party must be given the benefit of every favorable inference" (Parris-Kofi v Redneck, Inc., 204 AD3d 1180, 1181 [3d Dept 2022]).

## Threshold Procedural Challenge

As a threshold matter, the parties dispute whether the Court has the discretion to entertain the plaintiff's second summary judgment motion. "Generally, successive motions for summary judgment should not be entertained, absent a showing of newly discovered evidence or other sufficient cause" (Consolidated Mtge., LLC v Westport Golf Invs., LLC, 141 AD3d 923, 925 [3d Dept 2016] [internal quotation marks and citation omitted]). As explained by the Third Department, "evidence is not 'newly discovered' simply because it was not submitted on the previous motion" (MLCFC 2007-9 ACR Master SPE, LLC v Camp Waubeeka, LLC, 123 AD3d 1269, 1271 [3d Dept 2014] [internal quotation marks and citation omitted]). Rather, the movant must demonstrate that material facts were unavailable to it at the time of its prior motion, and that such facts could not have been established on its prior motion through alternative evidentiary means (see id.). Accordingly, "if the facts or arguments now advanced could have been submitted in support of the original motion for summary judgment, the successive motion should not be permitted" (id.).

Regarding the contract claim (duty of good faith), the prior motion papers did not present any arguments on this claim or seek to dismiss it. The Court's decision also did not address this claim. Considering that this claim was not part of the prior motion, and that the parties have since

11

engaged in several years of discovery, the Court will consider the merits of the contract claim on this summary judgment motion (discussed below).[4]

Regarding the trespass and nuisance claims, the prior decision determined that a triable issue of fact existed based on the affidavit of the defendants' expert, who opined that alternate sources existed for the water infiltration. In opposition to the second motion, the defendants have submitted another affidavit from their expert, who has again re-opined (this time based on even more information) that such alternative sources continue to exist. Notwithstanding the discovery conducted after the prior motion was made, the plaintiff has failed to demonstrate that any new facts exist that would render the opinions of the defendants' expert as conclusory, speculative, or unsupported (i.e., insufficient to create an issue of fact). At best, the plaintiff merely disputes the opinions of the defendants' expert and contends (through its architect) that the ground water data relied on by the defendants' expert is insufficient, while failing to offer any contradictory data or analysis on this issue.

Based on these circumstances, the Court finds that it would be inappropriate to consider the successive summary judgment motion for the trespass and nuisance claims and that the prior Order denying summary judgment is the law of the case (see Consolidated Mtge., LLC, 141 AD3d at 925; MLCFC 2007-9 ACR Master SPE, LLC, 123 AD3d at 1271; Brownrigg v New York City

---

[4] The Court disagrees with the defendants' position that any damages recoverable on the contract claim would be dependent upon whether the water runoff from their roof is damaging the plaintiff's building or otherwise infiltrating it. Rather, an appropriate remedy for the alleged breach of the duty of good faith and fair dealing for this case (which involves an agreement to negotiate) would be a judgment directing the defendants to re-enter into the negotiations or awarding the plaintiff reliance damages, if any (see Goodstein Constr. Corp. v City of New York, 80 NY2d 366, 371-374 [1992]; Cresco Labs N.Y., LLC v Fiorello Pharms., Inc., 217 AD3d 539, 540 [1st Dept 2023]; L-7 Designs, Inc. v Old Navy, LLC, 647 F3d 419, 430-431 [2d Cir 2011]; see also 1 Corbin on Contracts § 2.8, at Section 1.e [Bender 2024] [discussing the remedies available for the breach of an agreement to negotiate in good faith]).

12

Hous. Auth., 29 AD3d 721, 722 [2d Dept 2006]; Spa Realty Assocs. v Springs Assocs., 213 AD2d 781, 783 [3d Dept 1995]; compare Gitman v Martinez, 169 AD3d 1283, 1284-1285 [3d Dept 2019]).

Further, the Court agrees with the defendants that the source of the water infiltration is also a critical issue necessary to resolve the negligence claim. As such, the holding of the prior Order applies equally to the negligence claim as well. Nonetheless, even if the Court were not precluded from considering this part of the motion for the negligence claim, the Court would nonetheless deny the motion for other reasons (discussed below).

## Negligence Claim

Regarding the merits of the negligence claim, the plaintiff relies on the general duty owed by a property owner to exercise reasonable care in the maintenance of its property to prevent foreseeable injury that might occur on the adjoining property (see Broxmeyer v United Capital Corp., 79 AD3d 780, 782-783 [2d Dept 2010] [maintenance and operation of HVAC units]; Gellman v Seawane Golf & Country Club, Inc., 24 AD3d 415, 418 [2d Dept 2005] [operation of a driving range]). The parties dispute whether this general rule applies to roof water runoff cases where the defendant does not make any improvements and the plaintiff purchases and develops its lot after the defendant's use has already been established.

The defendants contend that, given the facts of this case, the law of water precludes any finding of liability against them for negligence (as well as trespass and nuisance). The defendants cite to the holding in Kossoff v Rathgeb-Walsh, Inc., 3 NY2d 583 (1958), which limits liability for water runoff from improvements. Kossoff, however, appears to be readily distinguishable, as it involved the water rights as between upper and lower lot owners. The water law treatises cited in Kossoff further discuss the different rules that have been applied in roof drainage cases (see

13

Farnham on The Law of Waters and Water Rights, Vol. 3, § 888a, pp. 2581-2585 [1904]; Gould on The Law of Waters, §§ 292-293, pp. 569-570 [3d ed 1900]).[5]

Nonetheless, as the defendants have not cross-moved for summary judgment, the Court need not address this issue any further on this motion. For a resolution of the issue in favor of the plaintiff would not entitle it to summary judgment in its favor. Summary judgment is a "drastic remedy," which "should not be granted where there is any doubt as to the existence of such issues, or where the issue is arguable"; "issue-finding, rather than issue-determination, is the key to the procedure" (Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395, 404 [1957] [internal quotation marks and citations omitted]).

Here, the defendants have set forth a series of facts upon which a rational fact finder could conclude that they did not breach any duty owed to the plaintiff. Among other things, the defendants contend that the building was constructed in the 1800s; that the water runoff from the roof results from the original design of the building, which they did not control; that the prior owner was aware that the water naturally flowed from the roof onto its adjoining lot (79 Henry Street); that the water flowed in this manner for decades, without any problems; that they acquired a prescriptive easement for this drainage; that they installed a gutter at some point to further benefit their property, but that the gutter was removed without their consent; that they attempted to resolve the issue by negotiating with the plaintiff, but that the parties could not agree on material terms; that the solution involves various complex concerns, including municipal oversight and the cost for roof repairs, as well as the potential for system failure and the cost to maintain and replace the system; that their use preceded the plaintiff's purchase and development of 79 Henry Street; that

_____

[5] In this Court's view, the facts of this case appear to be more similar to Hollenbeck v St. Mark's Lutheran Church, 154 App Div 328 (3d Dept 1912) and Theofilatos v Koleci, 105 AD2d 514 (3d Dept 1984).

14

the plaintiff created the problem by failing to secure a final written agreement on the catchment system's design prior to constructing the three-story stair tower in the enclave; and that the plaintiff has exaggerated the alleged impact on its building from the water runoff.

Further, even if the plaintiff manages to persuade the jury that the defendants breached a duty of care, the plaintiff will still have to establish that the breach proximately caused its injuries. As the issue of causation is inherently factual, the issue of proximate cause is ordinarily left for a jury to resolve at trial (see Palmatier v Mr. Heater Corp., 163 AD3d 1228, 1231 [3d Dept 2018]). Again, the defendants have submitted an affidavit from an expert opining that the water runoff is not the proximate cause of the plaintiff's injuries. As explained above, this alone creates an issue of fact. In addition, the issues of causation and damages are too intertwined in this case to separate the two for the jury.

In support of its negligence claim, the plaintiff also relies on alleged violations of the Property Maintenance Code of New York State (see 19 NYCRR part 1226), which is one of the codes comprising the New York State Uniform Fire Prevention and Building Code (see 19 NYCRR 1219.1). Specifically, the plaintiff relies on two sections which prohibit property owners from creating a "public nuisance" from roof drainage.[6] The plaintiff also relies on alleged violations of the State's plumbing code. The defendants dispute that they violated the maintenance/building code. They further dispute that the plumbing code has any application to facts of this case for purposes of imposing liability on them.

---

[6] It is not entirely clear how rainwater runoff onto the plaintiff's unoccupied building creates a public nuisance or how such a public nuisance (e.g., water running onto the sidewalk) has caused the alleged monetary damages that it seeks to recover in this action (see Brown v BT-Newyo, LLC, 93 AD3d 1138 [3d Dept 2012]).

15

Neither party has cited or discussed any legal authority interpreting these specific code provisions (see Brown v BT-Newyo, LLC, 93 AD3d 1138 [3d Dept 2012] [interpreting the same language regarding the discharge of roof water under a prior version of the maintenance code]). In any event, even if these code provisions applied, they would not be dispositive on the issue of liability. Rather, the jury would still have to determine whether the defendants acted negligently based on all the evidence presented, and whether the alleged code violations proximately caused the plaintiff's injuries (see Hill v Cartier, 258 AD2d 699, 701 [3d Dept 1999]; Brigandi v Piechowicz, 13 AD3d 1105, 1106 [4th Dept 2004]; PJI 2:29; see also Hartnett v Zuchowski, 175 AD3d 1831, 1832 [4th Dept 2019] [internal quotation marks and citation omitted]; see Elliott v City of New York, 95 NY2d 730 [2001]; DiLallo v Katsan LP, 134 AD3d 885 [2d Dept 2015]).

Accordingly, no basis exists to grant summary judgment in favor of the plaintiff on the negligence claim.

## The Duty of Good Faith and Fair Dealing

Turning to the merits of the contract claim (duty of good faith), the plaintiff alleges in its pleading that the defendants breached the covenant of good faith and fair dealing in connection with their performance of the stipulation. Specifically, the amended complaint alleges that "the parties agreed to discuss the design and construction of the rainwater catchment system" (Paragraph 72); that Mr. Izzo "agreed" with the design of the plaintiff's architect during a meeting on April 3, 2019 (Paragraph 76); that the plaintiff designed/constructed the system at its sole cost and expense in reliance on Mr. Izzo's agreement at the April 3, 2019 meeting (Paragraph 77); and that the defendants have since refused to agree to the plaintiff's design because they do not desire to pay for the cost to make certain repairs necessary to install the system (Paragraph 80).

16

"Implied in every contract is a covenant of good faith and fair dealing, which is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement" (Fourth Branch Assocs. Mechanicville v Niagara Mohawk Power Corp., 235 AD2d 962, 965-966 [3d Dept 1997] [internal quotation marks, citation, and alterations omitted]). Where parties enter into a binding stipulation to negotiate a future agreement, they are required to negotiate in good faith (see IDT Corp. v Tyco Group, S.A.R.L., 23 NY3d 497, 502-504 [2014]). The parties' failure to reach an agreement, however, is not alone sufficient to infer bad faith or unfair dealing (see id.).

In support of the motion, the plaintiff has submitted affidavits from itself, as well as its contractor (project manager) and architect, averring that Mr. Izzo agreed to the plaintiff's design at a meeting on April 3, 2019, and that the defendants thereafter refused to install the system. A critical problem with the plaintiff's summary judgment motion, as it relates to this claim, is that the defendants, their architect, and their attorney (Mr. Cromie) have all unequivocally denied in their affidavits that any agreement was reached at the April 3, 2019 meeting. They have further described in detail the parties' numerous discussions about the rainwater catchment system and provided several rational reasons for rejecting the plaintiff's design. In addition, they have provided copies of the parties' correspondence evidencing their good faith communications. The plaintiff's request for judgment as a matter of law on this claim is therefore untenable.

Further, the correspondence does not evidence any bad faith, especially as this case involved an arm's length negotiation in which both sides were represented by counsel. While Mr. Izzo may have certainly negotiated aggressively and acted in his own self-interest, this does not amount to any bad faith (see IDT Corp. v Tyco Group, S.A.R.L., 54 AD3d 273, 275 [1st Dept

17

2008], affd 13 NY3d 209 [2009]; see also IDT Corp., 23 NY3d at 504). In fact, the record establishes that the plaintiff acted as equally as aggressive to promote its own self-interest. The plaintiff, for example, filed two other lawsuits against the defendants, including a case involving the City that was discontinued (Index No. EF20221242) and the prior RPAPL 881 proceeding, which sought to disconnect the defendants from their sewer line access for 45 Caroline Street and unilaterally relocate the defendants' sewer line easement for 47 Caroline Street.

Similarly, the record fails to substantiate the plaintiff's bald allegation that Mr. Izzo agreed to a specific design at the April 3, 2019 meeting. The averments in the plaintiff's pleading and supporting affidavits are entirely conclusory on this issue. The deposition transcripts further do not provide the necessary details required to permit such a conclusion. When asked about the meeting, for example, the plaintiff's owner could not even recall it. He did not know what Mr. Izzo said or did during the meeting. Similarly, plaintiff's architect could not remember the words used by Mr. Izzo or the details agreed upon at the meeting. He just recalled having a "sense." Moreover, while the contractor (project manager) provided some further details, his testimony at best suggests that the parties were merely getting close to reaching a final agreement at the April 3, 2019 meeting.

Despite three attorneys being present at the meeting, the Court is baffled that not a shred of documentary proof has been presented to support the plaintiff's conclusion that the parties resolved this issue at the meeting. To the contrary, the plaintiff simply relies on the contractor's notes/report. Although those notes appear to contain a list of "agreed upon items" from the meeting, the list includes only a few items and fails to include or otherwise refer to any rainwater catchment system design.

18

Further, even if Mr. Izzo had "approved" the plaintiff's design, this alone would not have resolved the matter, as numerous other terms still had to be resolved during the negotiations. This is perhaps best reflected by a general review of the various other terms set forth in the unsigned agreement from April 2019. For example, the proposal requires Mr. Izzo to pay for certain repairs and maintenance costs. As there is no evidence that Mr. Izzo agreed to assume this responsibility during the negotiations, the plaintiff has failed to establish that the parties had reached a final agreement.

Moreover, the parties were also represented by counsel, with the plaintiff's interests being represented by two attorneys at the meeting. Even assuming that such an agreement regarding the final terms for the improvements to the defendants' roof was not barred by the statute of frauds, the parties had a prior history of insisting upon a written agreement to resolve this very same dispute. Yet, no such agreement was signed by the defendants. In 2018, for example, the plaintiff's contractor and Mr. Izzo previously entered into an MOU to locate the sewer line. The contractor further requested Mr. Izzo to sign an MOU approving a catchwater design and noted that it was waiting for Mr. Izzo's signature. The plaintiff further alleges that Mr. Izzo reached a similar agreement at a May 25, 2018 meeting, yet the plaintiff's counsel followed up two months later (in July 2018) by sending a different proposal to Mr. Izzo's counsel which specifically required a "formal legal agreement" to resolve the dispute. Perhaps most telling, the plaintiff's counsel prepared a formal legal document after the April 3, 2019 meeting (i.e., the draft settlement agreement) and submitted it to Mr. Izzo to sign. When no such signature page was forthcoming, this should have been a red flag.

In addition, the record reflects that Mr. Izzo was relying on his architect for advice, that his architect was unable to attend the meeting, and that Mr. Izzo and his counsel followed up with his

architect after the meeting to obtain his comments. When considering the highly technical nature of the proposed system, requiring a layperson to rely on the advice of an architect/engineer, these circumstances support the defendants' position that no such agreement was reached at the meeting.

The Court disagrees that the defendants consented to the plaintiff's design by signing the agreement terminating the sewer line easement. While Number 8 in the stipulation anticipated that the parties would reach an agreement on their responsibilities for the protective measures prior to executing this document, it is undisputed that the defendants did not sign the related agreement prepared by the plaintiff on the protective measures. There is also insufficient evidence to establish that the parties entered into any agreement on the "scope", "nature", and "responsibilities" for the rainwater catchment system. Nonetheless, the defendants' consent to the termination of the sewer easements (which they agreed to do in the stipulation), without a resolution of the protective measures, does not mean that they impliedly agreed to use the plaintiff's design. Rather, what logically follows is that the parties could not reach an agreement on the protective measures, but nonetheless both sides decided to execute the termination agreement for the sewer line easement. Such conduct did not require the defendants to accept the plaintiff's design by default. No legal authority or language in the stipulation supports the plaintiff's assertions to the contrary.

Further, the parties' stipulation did not intend to use the plaintiff's design from May 24, 2018. The stipulation clearly omits any reference to any specific design and contains unequivocal language indicating that no such agreement existed at the time (i.e., "enter into discussions" (Number 7) and "after agreement" (Number 8)). In fact, as discussed above, the amended complaint and the draft agreement prepared by the plaintiff's counsel both acknowledge that no such agreement was reached in the stipulation on this issue. Further, the plaintiff did not have the unilateral right to select the design. Rather, the defendants bargained for the right to discuss and

20

negotiate over the "nature" and "scope" of the system's design, as well as the parties' "responsibilities."

The plaintiff also asserts that its design should be used because it has paid for relocating the sewer line. However, this is exactly what the plaintiff bargained for in the stipulation. The plaintiff further received a benefit for this, specifically the right to temporarily access the defendants' property and the termination of the defendants' easement to use the prior sewer line. Moreover, the plaintiff also contends that it has installed a stormwater drainpipe. However, the plaintiff fails to elaborate any further on the facts surrounding this alleged expenditure or otherwise articulate any legitimate basis to conclude that such renders the defendants liable for a breach of the duty to negotiate in good faith. Similarly, the plaintiff has also failed to articulate how this alleged expenditure somehow obligates the defendants to use the plaintiff's design and pay for the maintenance and repair costs associated with the design, as well as other costs needed to make improvements to its roof to install it.

Based on the circumstances, the Court concludes that a rational fact finder could not find that the defendants breached the duty of good faith and fair dealing in connection with the November 5, 2018 stipulation. Accordingly, the Court grants summary judgment on the first cause of action in favor of the defendants (see CPLR 3212 [b]).

Further, while the plaintiff has not sought summary judgment on the second cause of action (promissory estoppel), the Court cannot ignore that this claim is similarly based on the same alleged agreement/promise made by Mr. Izzo at the April 3, 2019 meeting. Again, as the proof is insufficient to support a finding that any such agreement/promise occurred, this claim is also legally unsound. In addition, given that the history of the parties' negotiations, as well as the surrounding circumstances (i.e., their representation by legal counsel and the defendants' refusal

21

to sign the follow up draft agreement), the plaintiff cannot establish any detrimental reliance on the alleged promise made at the April 3, 2019 meeting. Accordingly, the second cause of action is also dismissed.

## The Affirmative Defenses

The plaintiff also seeks summary dismissal of the defendants' affirmative defenses pursuant to CPLR 3211(b). The plaintiff contends that the affirmative defenses are inadequately pleaded and lack merit.

A plaintiff "may move for judgment dismissing one or more defenses, on the ground that a defense is not stated or has no merit" (CPLR 3211[b]). In considering the motion, the Court must "liberally construe the pleadings, accept the facts alleged by defendant as true and afford [the defendant] the benefit of every reasonable inference" (DeThomasis v Viviano, 148 AD3d 1338, 1339 [3d Dept 2017]; see Umoh v Doolity-Mills, 214 AD3d 1226, 1227 [3d Dept 2023]). In addition, defendants may remedy any defects in their pleading through their opposition papers (Lewis v U.S. Bank N.A., 186 AD3d 694, 697 [2d Dept 2020]). Further, where any doubt exists "as to the availability of a defense, it should not be dismissed" (Nahrebeski v Molnar, 286 AD2d 891, 891 [4th Dept 2001]; see also Lewis, 186 AD3d at 697).

A plaintiff seeking to dismiss a defense for lack of merit bears a heavy burden to demonstrate that the defense lacks merit as a matter of law (Umoh, 214 AD3d at 1227; see also DeThomasis, 148 AD3d at 1339). A conclusory affidavit, without any documentary evidence to support a challenge to the merits of the defense, is insufficient (see Umoh, 214 AD3d at 1227; Wright v State of New York, 192 AD3d 1277, 1279-1280 [3d Dept 2011]). On the other hand, a plaintiff seeking to dismiss a defense as deficient on its face is not required to submit any evidence

22

in support of the motion (Higgitt, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR 3211:36, p 65).

Based upon its review of the pleading, the Court finds that the affirmative defenses have been adequately pleaded (see CPLR 3013; 3026; see also Wright, 192 AD3d at 1279; Brodeur v Hayes, 305 AD2d 754, 755-756 [3d Dept 2003]). Even if any pleading defects had existed, the defendants have cured the alleged defects by providing discovery responses and answering questions at their depositions (see CPLR 3026). Further, the plaintiff has neither addressed the merits of the defenses in any meaningful manner, nor has it provided any competent evidence to challenge them. As such, the plaintiff has failed to show that the defenses lack merit as a matter of law (see Wright, 192 AD3d at 1279).

Regarding the affirmative defense for a prescriptive easement, the plaintiff has failed to adequately brief this issue. To the extent that the plaintiff implies that the claim is barred based on the general rule that a party may not acquire an easement to light and air (see Plaintiff's Reply Memorandum, at p. 11, citing Cohan v Fleuroma, Inc., 42 AD2d 741 [2nd Dept 1973]), this argument is entirely undeveloped. This contention also fails to recognize the distinction between negative easements (e.g., restrictions on development) and affirmative easements (e.g., those seeking to access or use a neighboring property for a specific purpose). The plaintiff's contention further fails to acknowledge the legal authority recognizing easements by prescription (or acquiescence) for roof water drainage (see Farnham on The Law of Waters and Water Rights, Vol. 3, §§ 809, 888a, pp. 2377-2379, 2581-2585 [1904]; Gould on The Law of Waters, § 293, pp. 569-570 [3d ed 1900]; see also Neale v Seeley, 47 Barb 314 [Sup Ct, General Term 1866]; DeStefano

23

v Meglio, 64 Pa D & C 599 [Pennsylvania 1948]; Cherry v Stein, 11 Md 1 [Maryland 1858]; Vincent v Michel, 7 La 52 [Louisiana 1834]).[7]

Further, the deeds reflect that the parties acquired their parcels from a common grantor. The former owner of the properties allegedly used and maintained the roof in the same manner prior to the conveyances. It would seem somewhat unjust if the prior owner was allowed to prosecute an action against the defendants for not correcting the alleged problem after the conveyance. As a purchaser of real estate derives its rights through the grantor, it would similarly seem unjust to allow a subsequent purchaser of the impacted parcel (79 Henry Street) to similarly prosecute such an action (see Farnham on The Law of Waters and Water Rights, Vol. 3, §§ 830 & 831, pp. 2440 & 2444 [1904] [explaining that an artificial condition created by a common grantor on one lot "must be regarded as the natural condition of the property by subsequent grantees [of the servient lot] who purchased with notice of the condition so established"]; see also § 833, at p. 2455-2456 ["if the owner of a tract of land has created an easement in favor of one portion, and then sold that portion, his remaining land is subject to the servitude and will pass into the hands of purchasers under that burden"]). Notably, neither side has briefed these legal issues or the potential application of an easement by implication or necessity (see id. §§ 830-835, at pp. 2440-2460).

The plaintiff also relies on the defendants' use of a gutter in the location of the water runoff. The existence of the gutter, however, creates several additional unresolved issues of fact. Among other things, unresolved issues of fact exist regarding whether the defendants acquired an easement

---

[7] Assuming a prescriptive easement exists, this would not necessarily permit the defendants to continue draining water between the two buildings. The Court, for example, would consider a request to authorize its forced relocation based on equitable considerations (see Lewis v Young, 92 NY2d 443 [1998]; Annotation, Relocation of easements [other than those originally arising by necessity]; rights as between private parties, 80 ALR2d 743; compare Clayton v Whitton, 233 AD2d 828 [3d Dept 1996]). Notwithstanding, this issue may soon be a moot point given that the defendants appear to be working on a resolution acceptable to the plaintiff for the roof drainage.

24

[* 24]

for drainage prior to installing the gutter; whether the defendants interrupted the prescription period or abandoned any drainage easement by installing the gutter; whether the defendants intended to unilaterally relocate or modify any drainage easement using the gutter and, if so, the effect; and whether the defendants acquired any additional easement rights from their use of the gutter.

The plaintiff further alleges that the defendants waived the alleged prescriptive easement for water drainage by the parties' stipulation on November 5, 2018 and by the parties' agreement to terminate the sewer easements. The plaintiff contends that, pursuant to these agreements, the defendants agreed to permit the plaintiff to construct the building with a zero-lot line. It is not entirely clear how the construction of the new building along the property line would be inconsistent with an alleged easement to discharge water onto the building. To the extent that the plaintiff contends that the water runoff prevents it from using its building, that is a major issue in dispute in this case. In any event, the terms of the stipulation and the parties' agreement to terminate the sewer easement were prepared by legal counsel. Neither agreement resolved the stormwater drainage issue. Neither contained any provision waiving any easement for stormwater drainage. Neither provided any clear indication about the existence or consequences of a waiver. Based on the circumstances, the Court finds that the plaintiff's interpretation of these agreements to find an implied waiver is unreasonable, and, in any event, any such interpretation would be improper for the Court to adopt on this motion, as the evidence must be viewed in the light most favorable to the defendants, as the non-moving parties.

To the extent not discussed above, the Court has considered the parties' remaining contentions and finds them to be either unpersuasive or lacking in merit.

It is therefore,

**ORDERED**, that the plaintiff's motion seeking partial summary judgment in its favor is **DENIED**; and it is further

**ORDERED**, that summary judgment is **GRANTED** in favor of the defendants on the first and second causes of action (see CPLR 3212[b]). Those causes of action are hereby dismissed.

This shall constitute the Decision and Order of the Court. The Court is hereby uploading the original decision into the NYSCEF system for filing and entry by the County Clerk. The Court further directs the parties to serve notice of entry in accordance with the Local Protocols for Electronic Filing for Saratoga County.

So-Ordered.

Dated: August 21, 2024
at Ballston Spa, New York

HON. RICHARD A. KUPFERMAN
Justice Supreme Court

Papers Considered:
NYSCEF Doc. Nos.: 113-214

26